UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA,


          – against –                                              No. 20-cr-411 (RA)

ZISHE ABRAHAM,

                         Defendant.
------------------------------------------------------------------------x

---

## SENTENCING MEMORANDUM OF DEFENDANT ZISHE ABRAHAM

---

**MEISTER SEELIG & FEIN PLLC**
*Attorneys for Zishe Abraham*
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     ZISHE'S LIFE IS FOCUSED ON CARING FOR HIS CHILDREN AND FAMILY
        MORE BROADLY: HIS PRIORITIES SHOULD FEATURE PROMINENTLY IN THE
        COURT'S SENTENCING CONSIDERATIONS............................................................ 2

        A.      Zishe is a Superlative Family Man: He is Devoted to the Daily Care and Support of
                His Children, and His Absence Would Leave a Gaping Void in Their Young Lives
                ........................................................................................................................ 3

        B.      Zishe's Exceptional Kindness and Thoughtful Nature Extends Beyond Caring for
                his Immediate Family; He Takes Great Pains to Regularly Look After his Extended
                Family and In Laws ............................................................................................. 8

III.    EVEN IN THE MIDST OF THE STRESS OF THIS CRIMINAL PROSECUTION,
        ZISHE FOCUSED ON CONTRIBUTING TO HIS COMMUNITY .............................. 12

        A.      Zishe Pursued EMT Training to Fill a Gap in his Community............................. 12

        B.      Zishe Fosters a Warm and Welcoming Sense of Community in the Local
                Synagogue he Helped Found ................................................................................. 14

IV.     A CUSTODIAL SENTENCE IS UNNECESSARY TO ACHIEVE THE TWIN AIMS OF
        FEDERAL SENTENCING: DETERRENCE AND REHABILITATION ...................... 17

        A.      Zishe is Deeply Sorry for his Crime .................................................................... 17

        B.      Zishe is Determined to Build a Better Life for Himself and his Family; A
                Guidelines Sentence Would Only Undermine his Progress ................................. 20

        C.      Zishe's Acceptance of Responsibility and Active Progress Towards Rehabilitation
                Serve as a Positive Model, Achieving General Deterrence .................................. 23

V.      PRIOR TO DETERMINING ANY APPROPRIATE RESTITUTION, THE COURT
        SHOULD REQUIRE PRODUCTION OF AMAZON'S UNDERLYING RECORDS .. 25

VI.     CONCLUSION.......................................................................................................... 26

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007) ............................................................................................ 2

*Peugh v. United States*,
569 U.S. 530 (2013) .......................................................................................... 2

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................................. 2

*United States v. Bannister*,
786 F. Supp. 2d 617 (E.D.N.Y. 2011) ........................................................... 23

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012) ............................................................. 2

*United States v. Gushlak*,
728 F.3d 184 (2d Cir. 2013) ........................................................................... 26

*United States v. Ortega*,
09-CR-742, 2010 WL 2541364 (E.D.N.Y. June 17, 2010) ............................ 20

*United States v. Pizzino*,
419 F. App'x 579 (6th Cir. 2011) ................................................................... 25

*United States v. Sabhnani*,
599 F.3d 215 (2d Cir.2010) ............................................................................ 26

*United States v. Yalincak*,
853 F.3d 629 (2d Cir. 2017) ........................................................................... 26

**Statutes**

18 U.S.C. § 3553 ...................................................................... 1, 2, 17, 23, 24, 25, 27

**EXHIBIT LIST**

| |
|---|
| **Exhibit A: Zishe Abraham Letter** |
| **Exhibit B: Letters from Family** |
| Fishl Abraham |
| Zelda Abraham |
| Esther Altman |
| Yisroel Altman |
| Yosef Altman |
| Moshe Shaya Furth |
| **Exhibit C: Letters from Friends and Community Members** |
| Pinchas Braver |
| Joel Brody |
| Eli Ekstein |
| Yisroel Chaim Gold |
| Rabbi Lipa Hager |
| Gittel Helfand |
| Yitzchok Holczler |
| Rabbi Moshe Margaretten – Tzedek Association |
| Elazar Menachem Mon Massarano – Emergency Care Programs |
| Joshua Reich |
| Abraham Joshua Reifer |

| |
|---|
| Mac Schlesinger |
| Yakov Steinfeld |
| Moshe B Teitelbaum |
| Efraim Wachsman |
| Frimy Rosenberger |
| David Wagschal |
| Leiby Zwiebel |
| **Exhibit D: Zishe Abraham's EMT Certification** |

Defendant Zishe Abraham respectfully submits this sentencing memorandum in support of his request for a time served sentence.

## I.    INTRODUCTION

The sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary."  18 U.S.C. § 3553(a).  And per the sentencing statute, considerations beyond Zishe's crime—for which he has fully and openly accepted responsibility—merit significant weight in determining what sentence is required here.

In the nearly five years since ceasing the offense conduct, Zishe has reoriented his life.  He is now solely focused on investing in his family, and building a home environment in which his two young children can thrive.  Zishe is a terrific and involved father to his two young children ███████████████████.  He invests hours with them each day, preparing them for school and bedtime, reviewing their classwork, talking about their school days, and just imparting age appropriate wisdoms on his young children.  Zishe's children rely on their father: they know he will be home from work at the same time each day, and they wait for him by the window just bursting with excitement to share their experiences with him.  Zishe's family is his "whole world," Ex. A, Zishe Abraham Ltr. at 1, and since his arrest almost four years ago, he has focused his life on them.

Zishe has also made great strides professionally.   After years of struggle since the Indictment, Zishe has finally established a web design business that brings his family a modicum of financial stability.  And throughout that arduous process of starting over, Zishe has emphasized to colleagues, friends, neighbors—anyone who would listen—the importance of honest business practices.  As one friend described to the Court:

> One of the most admirable things about Zishe is his openness about his past mistakes. He frequently talks with people in the synagogue about his mistakes in

1

this case and encourages everyone to always do the right thing and follow the law. His honesty about his past wrongs has taught the entire community a great lesson, and we all admire how open he is.

Ex. C, Joel Brody Ltr.  Zishe has fully internalized the gravity of his mistakes.

These realities of Zishe's life should be central to the Court's crafting a just sentence. While the Court's sentencing analysis must begin "by correctly calculating" the applicable advisory Sentencing Guidelines range, *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)), that calculation, in this case 30-37 months imprisonment, is but one relevant element.  Given Zishe's family and community work, and the strides he has made in the years since the offense conduct ended in 2019, the Guidelines vastly overstate a reasonable sentence for Zishe.  *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").  A time served sentence is sufficient but not greater than necessary for Zishe Abraham.

## II.    ZISHE'S LIFE IS FOCUSED ON CARING FOR HIS CHILDREN AND FAMILY MORE BROADLY: HIS PRIORITIES SHOULD FEATURE PROMINENTLY IN THE COURT'S SENTENCING CONSIDERATIONS

The first statutory factor that the Court is instructed to consider is "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  "The Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence."  *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).  Zishe's life is focused on his commitment to his young children, and care for his family more broadly.  He prioritizes his time rearing his children, putting everything aside so that he can invest in their development every morning and evening.  Zishe also goes out of his way

2

for his extended family, inviting his elderly mother in law into his home for months at a time whenever she needs a little extra help, or just feels lonely. Zishe's family commitments reflect his shifted life focus in the last four years since his arrest in this case. His transformation warrants a time served sentence.

### A.    Zishe is a Superlative Family Man: He is Devoted to the Daily Care and Support of His Children, and His Absence Would Leave a Gaping Void in Their Young Lives

Zishe is a devoted father to his two young children. His daughter ███████████ ████████████. Zishe's wife Zelda expresses that "Zishe is a real father," involved in every aspect of his children's lives. Ex. B, Zelda Abraham Ltr. at 2. She recalls how Zishe doted on his children from the very start; just coming home to spend time with them was always the highlight of his day. When his daughter was first born, Zishe "would come home after a hard day of work zonked his first reaction was to see his precious baby girl and spend quality time with her. The same happened when ██████ was born too." *Id*. Zishe's role as a father comes first: "Tatty [daddy]/Zishe puts the priority on Family First. He is always available for our needs." *Id*. at 3.

Zishe structures his life so that he can be there to give his children daily time and attention. Colleagues and business associates comment on "Zishe's dedication to his family. Despite the demands of starting a business, he always prioritized being home with his family, even if it meant declining late meetings." Ex. C, Moshe Teitelbaum. Ltr. at 1; *accord* Ex. C, Pinchas Braver Ltr. ("One evening I knew Zishe was in the middle of an important project, I noticed Zishe left at the same time, so I asked him where he was going. He told me he needed to get home because his kids were waiting at the window, looking out for him. It was clear he really cares about his kids and didn't want to keep them waiting."); PSR ¶ 66 ("Mrs. Abraham characterized her husband as a 'kind, caring, loving, [and] giving' individual in his interactions with her, their children, family,

extended family, and friends.  She added that the defendant is a hard worker and actively involved in caring for their two young children.").

Although it may seem mundane, Zishe's dependable and constant presence in his children's lives is precisely what provides them with emotional stability.  Even at their young ages, his children know that they can count on him, and love to share with their dad.  Zishe's wife Zelda details how when Zishe is on his way home from work, "the kids sing [in Yiddish]: 'Tatty Geit Shoin Kimen' (Daddy is almost coming[]). They wait by the window and run as he arrives as if they haven't seen him in a long while. When Tatty [daddy] goes to synagogue they wave him goodbye with kisses and hugs and are sad to see him go."  Ex. B, Zelda Abraham Ltr. at 2.  Zishe and his wife Zelda's friend and neighbor, Gittel Helfand, who spends considerable time at their home similarly describes that:

> When [Zishe] comes home from work, the kids run to greet him, and tell him about their day. I have seen Zishe sit with them on the sofa and chat, very receptive to their needs. If the children have news to share before he arrives home from work they call him on the phone, or use creativity pressing the Ring doorbell to reach him. He speaks patiently, and respectfully to his son and daughter even if they are disturbing his work.

Ex. C, Gittel Helfand Ltr. at 2 ("Zishe is a loving father to his daughter and son. Their close relationship is evident from their interactions and conversations."); *accord* Ex. C, Yisroel Chaim Gold Ltr. at 1 ("when you look at Mr. Abraham and his cute beautiful kids standing near him during the blessings, you can tell how much they enjoy being together, even during the prayers. All you can do is smile and hope to see many more joyful years together.").

Zishe strives to make every day a special family day for his children.  "It is important to Zishe that the family eat dinner together and he will not forgo this time with his kids."  Ex. C, Gittel Helfand Ltr. at 2.  Although routine, each dinner is a sacred family time for Zishe, and he imparts the special feeling of their precious time together on his children.  ███████████

"need to tell him all about their day"—they know that their father wants nothing more than to listen attentively to whatever is happening in their young lives. Ex. B, Zelda Abraham Ltr. at 2. Zelda describes how the family "sit[s] around the [d]inner table and Tatty is listening. His listening ear and calm voice are a great combination that adds to the vibes in our cozy home." *Id.* The children:

> [F]eel Tatty is everything to them. . . . His presence gives them happiness, reassurance, safety, and a calming feel. . . .Tatty knows the best how to deal with their problems. Tatty takes care of their needs and wishes even that little thing like changing a battery to his toy. Tatty is the magic and answer to their pain.

*Id.*

Zishe prioritizes giving each of his children the individual love and attention that they need. *See* Ex. C, Gittel Helfand Ltr. at 2 ("Zishe makes sure to give his children the attention they need, making them feel secure and loved."). Zishe's cousin Moshe Furth observed during one recent festive Friday night Sabbath meal how Zishe "took the time to sit with each of his kids separately and go through their schoolwork and letters from their teachers. He paid full attention to each child, showing them love and making them feel important." Ex. B, Moshe Shaya Furth Ltr. at 1.

Zishe's most routine interactions with his children exude sweetness and gentle guidance. For example, Zishe's cousin recounts an occasion when he was visiting Zishe's family, and:

> [W]as surprised when in the middle of the meal one of the kids poured his drink over the chair and Zishe said Mazel Tov with a smile instead of getting angry, it made the entire atmosphere better, and then he helped the kids clean up. Through his own actions, Zishe taught the children how to react to something negative.

*Id.* at 2. That story is emblematic of Zishe's calm and steady demeanor as a father, so central to his children's upbringing.

Zishe is also an exceptionally attentive husband to his wife Zeldy. He not only shares the daily tasks of running their household, but is there to support her during challenging times, and steadfastly encourages her whenever she needs a boost of confidence. *See* Ex. B, Zelda Abraham

Ltr. at 1 ("Zishe's blend of being supportive, encouraging, loving, and connecting helped me get back to a new life I always dreamed about. . . . Zishe is so caring he won't leave if there is any need for support.").

Early in their marriage, Zishe's wife ████████████, which was devastating for both partners. Zelda recalls how hard that time was: "I was not able to handle the pain and not the loss." *Id*. at 2. She is candid that she could not have gotten through ████████ without Zishe by her side: "Zishe with his grounding nature was at my bedside at home and in the hospital and together we lived the challenge. Just the fact of his being [there] made me feel not alone. Wow, this is Zishe's specialty." *Id*. He was equally supportive during Zelda's ██████████████ ███████████████████████████████████████████████████████ █████████████████████." *Id*. Zishe was with Zelda every step of the way, and by Zelda's account "only with my dear husband at my side did I pull through." *Id*.

Zishe's support is not reserved for tough times, however. He encourages Zelda to pursue her passions and fulfill her own goals, amidst juggling their hectic family responsibilities. *See id.* ("Zishe is always encouraging and [giving Zelda] a powerful boost."). Zishe's encouragement was instrumental in Zelda pursuing her "degree after several years of working." *Id.* With Zishe's love, support and promotion, "[i]n no time [Zelda] was able to take the job of Headstart teacher and fulfill [her] career [goals]." *Id.* Zishe was there with Zelda every step of the way: "Zishe celebrated with me every test I passed and asked me how things were going. Zishe helped me continue to build my career. Today I am a child mentor, I teach Social Emotional Learning for boys and girls who are struggling in the classroom." *Id.* Currently, Zelda is preparing to teach a summer course for teachers, therapists, and mentors on social emotional learning to enhance the

local educators' ability to reach students who require more creative teaching skills. Zelda gives her husband a lot of credit for helping her continue to achieve her professional milestones.

But that is just who Zishe is. A stellar partner in everything in Zelda's life. As Zeldy expresses:

> Zishe is my right hand in everything. He takes care of the little errands like groceries to handling financials. . . . There are a lot of responsibilities on our plate. We work as a team and divide responsibilities so life can go on smoothly and keep a calm atmosphere in the air.

*Id*. at 4. Zelda is clear that their family would not work without Zishe: "I won't be able to cope or function on my own." *Id.* ("As much as we promise our kids, we never leave you alone. Tatty and Mommy are always here for you to protect you and to take care of your needs and wishes. You can rely on that. Can I really say this?? Am I able to do this on my own?? Absolutely not."); *accord* PSR ¶ 66 ("In addressing the prospects of the defendant's absence from the family, Mrs. Abraham wrote that she would not 'be able to cope or function on my own.'").

Zishe knows his crime has put his family stability squarely at risk. As Zishe tells the Court:

> It is very hard for me to . . . face that my failings jeopardize my family's future. Every day when I look in the mirror, I am horrified at myself that I didn't think first about the consequences and suffering that I was creating for my wife and kids, as I do now. My two sweet and innocent children who are ages 6 and 4, and my wonderful wife Zeldy mean everything to me.
>
> . . .
>
> Knowing that I risked my family hurts me more than you can imagine. I can't bear to think that my actions have risked my kids' chances. I know I can be better for myself and my family. And all I pray for is the chance to do that.

Ex. A, Zishe Abraham Ltr. at 1-2. While he is readily prepared to bear the consequences of his actions, he can only hope that his children will not have to.

**B.    Zishe's Exceptional Kindness and Thoughtful Nature Extends Beyond Caring for his Immediate Family; He Takes Great Pains to Regularly Look After his Extended Family and In Laws**

As a consummate family man, Zishe invests considerable energy in his extended family—Zishe and Zelda's extended family count on him in their times of need.  Perhaps no one has benefitted more from Zishe's giving nature than Zelda's mother, Zishe's mother in law Esther Altman.  Zishe's wife's father passed away after a long and arduous illness shortly before Zishe and Zelda met.  Zelda's family was devastated by the loss of their beloved patriarch, particularly Zelda's elderly widowed mother who was left alone in her twilight years.  *See* Ex. B, Zelda Abraham Ltr. at 1 ("my father was sick with diabetes and heart dysfunction, he had a pacemaker later he suffered from [u]lcers, blood pressure kidney issues, etc. . . . Especially the last year before he passed away after a major relapse . . . my siblings, and I set up a hospital in our house and we all took shifts to help my father . . . My father passed away on April 27, 2012 . . . . [My] mother . . . was taking this trauma extremely hard.  She lost her dear husband who was the backbone for all of us.  And then Zishe came into our life.").

As soon as Zishe and Zelda got married, Zishe took it upon himself to ensure that his mother in law was always cared for and never lonely.  *See* Ex. B, Yosef Altman Ltr. at 1 ("We lost our beloved Father 12 years ago, and since our mother was emotionally and physically drained, Zishe and his wife Zelda immediately added support and help when needed. We keep thanking Hashem for this special gift Zishe."); *see also* Ex. B, Yisroel Altman Ltr. at 2 ("I was the only sibling single at home with my mother who is elderly. Zishe always checked in with me if I/my mom needed anything. Since I wasn't working he was always making sure" we had everything we needed, and that "money was not something that would interfere with my/my mom's life."); Ex. B, Zelda Abraham Ltr. at 1 ("As we married he blended in well with my family members. He

helped me support my mother and siblings, especially after the tragedy of my father's death he was our supporter spiritually at that time.").

In the last decade, whenever Zelda's mother has required extra care and attention, Zishe and Zelda have opened their home to her, often for several weeks or months at a time.  As Mrs. Altman recalls:

> In 2019 I went through a difficult ████ and I needed a place to recover Zishe and Zelda came to support me and took me in, I was not able to go steps per the doctor's recommendations so they took their dining room and designated it for my room so I can recover and come back to the day to day.

Ex. B, Esther Altman Ltr. at 1. ████████████, Mrs. Altman's children were stressed about where she could comfortably recuperate—although Zelda has more than half a dozen siblings, none was in a position to provide their mother with a place to stay for months on end.  Zelda's brother, Yisroel Altman, who lived with their mother, was working in Brooklyn at the time, but "the hospital where the ████ was scheduled was in the Bronx."  Ex. B, Yisroel Altman Ltr. at 2.

Yisroel was at a loss for how to handle the logistics of his mother's recovery as she "would need help and the doctor told [Yisroel] that [his] mother would not be able to walk for some time." *Id*.  Yisroel recounts: "I got into a panic because my mom lives on the 4th floor and the elevator doesn't work all the time since it's old." *Id*.  Zishe gladly took his mother in law into his home during her long recovery period, and reconfigured his home for her comfort and convenience during that time.  As Yisroel recounts, Zishe called and said:

> "[W]hy are you not bringing your mother to me?" . . . He told me strongly, "I want your mother to come to me for 4 weeks. I have a backyard, front yard, etc, and this will be the perfect place where your mother can feel better and please don't say no!" . . . We also realized another problem, Zishe's house doesn't have any bedrooms on the first floor and my mother couldn't walk steps as per the doctor. . . . I called Zishe first thing he said, "I forgot to tell you that I don't have a bedroom downstairs I will take the dining room and make it a bedroom for your mother so she will be comfortable". I was like WOW I didn't tell him anything and he was so

9

thoughtful! In the end, my mother was there for 2 months till she got back to herself. While my mom was there Zishe always made sure that my siblings could come to visit and served them food, so they would be comfortable visiting.

*Id*. at 3.

Zishe similarly provided necessary care and comfort to his mother in law when she contracted Covid-19 in the very early days of the pandemic, at the beginning of March 2020.  She "████████████████████████████████████████████████████████████████ ████████████████████" where she "███████████████████████████████████████████████████████."

*Id*.  During that frightening time, when hospitals instituted policies to stem the spread of the virus, Mrs. Altman's children were not permitted to visit.  The family was in the dark regarding her condition and treatment of this then-novel virus.  *See id.* ("I did not feel that the hospitals were safe then and visitors were not allowed. . . . I asked to go up to her but it was denied. I was alone again, again by myself not knowing what to do.").  Throughout her hospitalization, Zishe checked in on his mother in law daily, and did everything he could to try and arrange the best care for her available at the time.  Although Mrs. Altman has eight biological children, it was Zishe who became the point person.  *See id*. at 3-4 (Zishe located "someone that might be able to help . . . We figured out a doctor who might be able to help . . . . Zishe didn't let this go and wanted my mother to be healthy and back home safely. He called me frequently day by day. Zishe was anxious to see my mother/his mother-in-law safe at home.").

Finally, after five weeks of hospitalization, Mrs. Altman was discharged from the hospital, although severely weakened and unable to walk.  *See id*. at 4 ("my mother came home after lots of hardships, of course with a lot of health damage. She was not able to walk yet then").  Zishe insisted that his mother in law convalesce at his home.  He called his brothers in law to reiterate that his home was open to her:

> He asked me why I didn't bring her to them to be able to have her space . . . . I said "No it's fine, I don't want you to be bothered". Zishe doesn't accept a no. Zishe did not sleep and called my brother and asked him the same question why don't I want Mom to go to him, if she needs anything else just Zishe will make her comfortable like in her own house. All Zishe wanted was for her to be healthy. My mother ended up by Zishe's house for a while and came back to herself.

*Id.* at 4; *accord* Ex. B, Zelda Abraham Ltr. at 2 ("Zishe took [it] upon [himself] to care for my widowed mother. Up until today, my mother and family have an open door in our house, which I appreciate. In times of her challenges when she had surgery and covid recuperation she came to us so she won't be alone and was able to recover."); Ex. B, Esther Altman Ltr. at 1 ("At the beginning of ████████████████████████████████████████████████████████████ ████████, thanks to the one above I stayed alive and left the hospital on the same date my husband passed away which was a miracle, ████████████████████████ I had to recover and Zishe and Zelda came to my hands and took me in for a few weeks and made me so comfortable and accepted in their house, giving me the care I was needed at this time.").

Of course, Mrs. Altman is welcome to stay with Zishe and Zelda anytime—not just during time of acute health risks or major life changes—and she does. In Mrs. Altman's words:

> Zishe and Zelda constantly are my support and come for the weekends and holidays when I feel lonely and the memory of my husband comes to me the most, they create a great atmosphere, and many times I will go to their house for weekends and holidays and Zishe will take me or pick me up when needed and be a support. Up until today Zishe and Zeldy are here for anything I need. They will invite me as a guest to their house and give me the world. They make me comfortable, Acceptance, space, and a part of the family.

Ex. B, Esther Altman Ltr. at 1; *accord* Ex. B, Yisroel Altman Ltr. at 4-5 ("my mother came over to me and told me that the best place she ever went and would ever go to was Zishe's house. The heart of giving and giving and giving none of her other kids do. The rest is history. My mother was there for a while and everyone knows whenever you need an outing there is the place . . . . If

11

it's a day or 7 days or more she is always welcome . . . My mother always tells me the best and most comfortable place to be on vacation or holiday is Zishe's house").

Zishe's thoughtful nature extends far beyond just his mother in law's well-being.  He goes out of his way for other in laws and cousins, whether they need financial help, or just attention and notice when they feel out of place.  *See* Ex. B, Yisroel Altman Ltr. at 1-2 ("in around 2014, one of our family members got into a money situation and needed to get help. He had a debt of 150k" and Zishe provided an interest free loan to the family member for the amount that they could not raise elsewhere and agreed to receive repayment only after everyone else was repaid: "Zishe's answer, before I could even finish talking was don't worry, first return the loans from all the other people and you will give me the last whenever you have it.").  For example, when Zishe's cousin Moshe moved back to New York after living in Arizona for several years, he felt uncomfortable and isolated at a family bar mitzvah: "Zishe noticed how I came in and I felt a little bit uncomfortable. He stood up and came over inviting me to come to sit next to him, he made a place and asked the waiter to bring a meal."  Ex. B, Moshe Shaya Furth Ltr. at 1.

Zishe's gift is noticing what those around him need, and doing what he can to put everyone at ease.  Zishe understands that sometimes even a small thoughtful gesture can make the difference; and the entire extended family knows that they can count on Zishe.  *See* Ex. B, Yisroel Altman Ltr. at 1 ("How special he is and how willing to help everyone. What a beautiful personality. He did this all by his wish and with a deeper understanding of everyone's needs.").

## III.    EVEN IN THE MIDST OF THE STRESS OF THIS CRIMINAL PROSECUTION, ZISHE FOCUSED ON CONTRIBUTING TO HIS COMMUNITY

### A.    Zishe Pursued EMT Training to Fill a Gap in his Community

In the midst of stress of this Indictment, Zishe did not wallow or turn in.  He directed his energies outward to better his community.  As part of that commitment, this past year, Zishe took

an EMT certification course.  Realizing that there were no EMTs in his synagogue, Zishe devoted what little free time he had outside his familial and professional responsibilities to gain the necessary skills and certifications.  The Rabbi of Zishe's synagogue, notes that the "spirit of service and community" that is "evident in every aspect of [Zishe's] life," propelled him to "complete[] his training to receive an EMT license to volunteer as the sole synagogue EMT, which our community currently lacks."  Ex. C, Rabbi Lipa Hager Ltr. at 2; *accord* Ex. C, Joel Brody Ltr. ("Zishe has also trained as an EMT, which is vital for our community since we do not have any EMTs in our synagogue. Zishe respects everyone's privacy and is the perfect person to handle people in times of crisis when every minute makes a big difference."); *see also*  Ex. D.  Zishe has now applied to volunteer with Hatzoloh EMS of Rockland County so that he can put his life-saving skills to use.

From the outset, Zishe took his EMT studies extremely seriously—knowing that he would deal in matters of life and death.  "Zishe was one of [the] top-performing students," and his instructor, Elazar Menachem Mon Massarano, extols Zishe's commitment to his work:

> From the first day, he stood out as a student who came to class to learn and participate, unlike some of the other students who just wanted to get their licenses and move on in life. He attended every class from beginning to end, not cutting any corners, and always there participating. He always came prepared for class, having reviewed the previous lessons in advance.

Ex. C, Elazar Menachem Mon Massarano Ltr. at 1.

Among the strongest students in his course, Zishe invested extra time to help other students who struggled—no small commitment for a father of two young children with myriad responsibilities.  *Id.* ("Not only did Zishe perform outstanding in class, on quizzes, and tests, but he also looked out for the struggling students, helping them with their studying before any quiz or test.  Every one of my students wanted to be his study partner.").

Zishe' EMT classmate, Joshua Reich, explains that the course entailed "about 150 hours of classroom instruction and another 150 hours of outside work." Ex. C, Joshua Reich Ltr. at 1. That proved overwhelming for Joshua, who "asked an instructor for assistance;" the instructor in turn "recommended that [Joshua] contact Zishe. He assured [Joshua] that if Zishe could help, [he]'d be in good hands." *Id.* Zishe did not hesitate. He and Joshua worked together, and Joshua reports that "[t]hanks to his guidance, [Joshua] passed one test after another." *Id.* "The night before our practical exam," however, Joshua needed yet more assistance. *Id.* As Joshua reports:

> Zishe suggested we get some real hands-on experience. He called the instructor to get permission to use the classroom and equipment, which we did for a few hours. The instructor even stopped by, and we had a productive practice session. Zishe walked me through the necessary steps and equipment once more.

*Id.* Joshua passed that exam too, and "applied to volunteer at Monroe EMS, where I now proudly serve." *Id.* at 2. Joshua "credit[s] Zishe for all his help and encouragement throughout the training. Without him, I don't think I would have succeeded." *Id.* Zishe and Joshua "spent hours together." Ex. C, Elazar Menachem Mon Massarano Ltr. at 1. The course instructor is clear about the profound impact Zishe had: "and all the people [Joshua] will save are to Zishe's credit." *Id.*

### B.    Zishe Fosters a Warm and Welcoming Sense of Community in the Local Synagogue he Helped Found

Zishe also commits much of his energy to fostering a sense of community and connection in his midst. In Zishe's Hasidic Jewish world, life revolves around the synagogue (*shul*). That is where friends are made, relationships are formed, neighbors gather several times a day, members consult about their daily troubles, and charitable work is organized. The synagogue is not just a place of worship, but the hub of community life.

When Zishe moved to his neighborhood, there was no synagogue in his immediate vicinity. Zishe saw the void, and "was very instrumental in building th[e] congregation from its inception." Ex. C, Gittel Helfand Ltr. at 2. The synagogue rabbi describes how Zishe "actively reached out to

14

residents in the neighborhood who were not yet members of any synagogue, inviting them to join our community."  Ex. C, Rabbi Lipa Hager Ltr. at 2.

Zishe's vision was building not just a synagogue—he wanted to foster a warm and welcoming place where everyone in the community had a role and felt involved.  Although most synagogues require annual membership dues, Zishe "strongly advocated for and succeeded in making [his community's] synagogue the only one in the neighborhood that does not require membership fees, because, as he said, everyone deserves to be part of a community, regardless of financial abilities." *Id*.

Even now that the synagogue is established, Zishe remains a pivotal force in ensuring that the synagogue continues to truly serve the community's needs.  In the small daily activities of prayer and gathering, he works to make "everyone feel[] welcome" and sees to it that everyone "has a place to sit." *Id*.  Zishe also actively "involve[s] individuals in the congregation by offering the[m] volunteer opportunities . . . . Zishe invites others to come join the davening [prayer services] and by giving them a role, makes sure they feel a sense of community."  Ex. C, Gittel Helfand Ltr. at 2; *accord* Ex. C, Abraham Joshua Reifer Ltr. at 1 ("Mr. Abraham acted as Gabbai (an unpaid sexton who will often take on wider community responsibilities, as I discuss later). His warmth and caring demeanor instantly made anyone that came through the door feel comfortable and at ease. I continue to see Mr. Abraham's attitude of equal respect and compassion in all his interactions, whether with congregant-members, visitors, or synagogue staff such as maintenance personnel.").

Although not wealthy himself, Zishe is a central force in the synagogue's charitable functions, supporting members in their time of duress—of course, Zishe benefitted tremendously from community support in the wake of this case, when he had to start from scratch and find a way

15

to support his family, and so, he knows the value of community in hard times. Other community members have taken note of Zishe's "understanding and selflessness." Ex. C, Joel Brody Ltr. A neighbor, Joel Brody, relates just "[o]ne incident that stands out. . . when a community member couldn't cover his bills, including food and rent. Zishe went above and beyond to raise funds to help this family, even reaching out to recruiters to help find him a new job. This shows his genuine concern for others." *Id*.

And there are myriad such examples of Zishe's thoughtful and discreet charitable work. Zishe's neighbor, Abraham Joshua Reifer. Recalls another example:

> [A]round a year ago, during the Passover holiday season. A fellow synagogue member and I were acutely aware of the financial challenges to local families needing to purchase already-expensive specialty holiday goods such as Matzah and kosher-for-Passover items, which was exacerbated by the post-pandemic economy and soaring inflation. We . . . eventually established a fund under the Rabbi's oversight to provide grants and interest-free loans to community members. The project was a very delicate one, as, in accordance with Jewish tradition, we wished to preserve the confidentiality and self-respect of recipients of financial aid. Given the sensitivity and importance of the endeavor, Mr. Abraham was recognized as the best candidate to be entrusted with its administration, a role he readily accepted. His empathy, compassion, and genuine care were instrumental in its success, and allowed community members to purchase Passover goods and holiday clothing for their children, ensuring they could celebrate the holiday with the same dignity as their neighbors and friends.

Ex. C, Abraham Joshua Reifer Ltr. at 1-2. Zishe's care "without a doubt, strengthened our local community," as do all of Zishe's community efforts. *Id.*

The hours that Zishe has devoted to his community without compensation or fanfare are a real testament to the type of person that he is now. Zishe has spent years focusing his energy on raising and supporting his family, and contributing to his local community. The Court should sentence Zishe based on who he has become since his arrest nearly four years ago. Family, friends, community members, and leaders all say the same: "Zishe is always the first to offer help, and if

16

he can't help you personally, he will try to find someone else who can."  Ex. C, Elazar Menachem

Mon Massarano Ltr. at 1.

## IV.    A CUSTODIAL SENTENCE IS UNNECESSARY TO ACHIEVE THE TWIN AIMS OF FEDERAL SENTENCING: DETERRENCE AND REHABILITATION

While Zishe's crime is certainly serious, the yearslong sentence provided by the Guidelines

does not properly calibrate "just punishment" that is "sufficient but not greater than necessary" to

meet the sentencing statute's goals.  A just punishment would give Zishe an opportunity to

continue rebuilding his life and caring for his family.  A time served sentence, would give him that

chance.  A lengthy Guidelines sentence, however, would only stymie any progress he has made

establishing himself as a contributing member of society since he ceased the offense conduct

almost five years ago.  Application of the Guidelines to determine Zishe's sentence would promote

precisely that perverse result.

Nor would a Guidelines sentence promote deterrence.  The sentencing statute requires that

the Court impose a sentence that is "sufficient, but not greater than necessary," to "afford adequate

deterrence to criminal conduct," and "protect the public from further crimes of the defendant."  18

U.S.C. §  3553 (a)(2)(C), (D).  Because Zishe has long since ceased any criminal conduct, and has

already felt the consequences of this serious criminal case for nearly years, these general and

specific deterrence goals are achieved without a custodial sentence.  An incarceratory sentence

would be "greater than necessary," contravening the sentencing statute.

### A.    Zishe is Deeply Sorry for His Crime

Zishe is deeply remorseful, and readily accepts responsibility for his crime:

I am deeply and painfully sorry for the crime I committed. It is very hard for me to write
this letter and face that my failings jeopardize my family's future. Every day when I look
in the mirror, I am horrified at myself that I didn't think first about the consequences and
suffering that I was creating for my wife and kids, as I do now. . . nothing can excuse the
wrong I did or the harm and pain my crime has caused my family. I take full responsibility
for my actions and the consequences.  But . . . the terrible mistakes that led me here also

forced me on a journey of self-reflection and made me stop and think about becoming a better person and prioritizing what is truly important in life. More than ever, I am committed to making sure that everything I do in life puts my family and the law first.

Ex. A, Zishe Abraham Ltr. at 1.

Zishe is forthcoming about the gravity of his past wrongs, and is committed to never again stray down the criminal path.  As Zishe's community rabbi, his trusted confidant, explains: "I have witnessed firsthand his genuine remorse for his past actions, and I have personally heard from him about how deeply sorry he is. He is dedicated to a future built on honesty and hard work."  Ex. C, Rabbi Lipa Hager at 2-3.  His brother Fishl reports similarly: "I have often heard Zishe express his deep regret for past mistakes and the lessons he has learned. He is now committed to conducting business the right way and ensures that everything he does complies fully with the laws of the United States."  Ex. B, Fishl Abraham Ltr.

Zishe has internalized the mistakes of his past, and has not merely committed himself to a law abiding life, but actively built one over the last four years.  Zishe's deeds are far more meaningful than just words of sorrow—Zishe is transformed.  He is "is a different person today, than he was a couple of years ago."  Ex. C, Gittel Helfand Ltr. at 3.  His new business in web design is:

> [B]uilt on honesty and respect. As a web designer, Zishe uses this platform to service clients in designing their websites with legitimacy. Employee and customer satisfaction are also a vital part of his business model. . . . He has expressed deep regret and deserves a clean slate henceforth. Zishe is eager to fulfill his responsibilities as an upright citizen.

*Id*.

Zishe has not shied away from the often embarrassing task of using his wrong choices as a model for community members of precisely what not to do.  One neighbor describes:

> I've seen him openly discuss his legal case, encouraging others to do business the right way and explaining the consequences of not following the law. He sometimes feels uncomfortable and blushes while talking about it, but he has told me many

18

> times that he is willing to feel uncomfortable if it means helping others avoid his mistakes and encouraging them to conduct business lawfully. I've heard from many people who refer to Zishe's teachings about his case. His openness has made the community much more aware of the importance of doing business within the law.

Ex. C, Yitzchok Holczler Ltr.; *see also* Ex. C, Eli Ekstein Ltr. ("One of the most impressive things about Zishe is his openness about past mistakes. He has openly recognized his mistakes in the case bringing him before Your Court").

Many friends, family, neighbors, and community members have similarly remarked regarding Zishe's willingness to use his own criminal errors as a model of how not to behave, and as a means of encouraging community members to conduct business honestly. *See, e.g.,* Ex. B, Fishl Abraham Ltr. (Zishe "preach[es] the importance of honesty and legal compliance in all business dealings, whenever he discusses business."); Ex. C, Eli Ekstein Ltr. (Zishe "now teaches others to conduct business legally and ethically. This shows his growth and commitment to being a better person. Zishe is now a completely different person, focused on doing things the right way."); Ex. C, Joel Brody Ltr. ("One of the most admirable things about Zishe is his openness about his past mistakes. He frequently talks with people in the synagogue about his mistakes in this case and encourages everyone to always do the right thing and follow the law. His honesty about his past wrongs has taught the entire community a great lesson, and we all admire how open he is."); Ex. C, Moshe Teitelbaum. Ltr. at 2 ("I witnessed him reaching out to another founder to encourage him to follow a straight and tough path and avoid repeating his mistakes."); Ex. C, Abraham Joshua Reifer Ltr. at 2 ("Mr. Abraham is open about his case and uses his experience to educate people in the community on the importance of conducting their business lawfully. He actively engages with community members, advising them to adhere strictly to legal standards in their endeavors.").

Zishe is dedicated to rebuilding his life for his family, and has already invested in the hard work of pursuing the straight and narrow path. Per Rabbi Lipa Hagler, Zishe's community rabbi, Zishe "actively encourages young individuals to pursue careers that are entirely legal and discusses with them how to avoid any opportunities that might be ethically or legally questionable." Ex. C, Rabbi Lipa Hager at 2-3. And beyond that, over the last several years, Zishe has transformed his life:

> Mr. Abraham's journey has been one of learning and rectifying. As you believe and advocate, one's past does not have to dictate one's future. In him, I see a man who has not only learned from his mistakes but has also used them as a path toward becoming a better individual, a devoted father, and a responsible citizen.

Ex. C, Rabbi Lipa Hager at 3. For the last several years, Zishe has worked assiduously to establish a stable, law-abiding life. He is invested in moving past his criminal conduct, achieving the deterrence and rehabilitation goals of sentencing. The Court should sentence Zishe to a non-custodial sentence accordingly. *See, e.g., United States v. Ortega*, No. 09-CR-742, 2010 WL 2541364, at *2 (E.D.N.Y. June 17, 2010) (where a defendant has demonstrated fundamentally good character, "specific deterrence is not a major concern.").

### B.    Zishe is Determined to Build a Better Life for Himself and his Family; A Guidelines Sentence Would Only Undermine his Progress

In the last five years since Zishe ceased the offense conduct, and since his arrest in this case nearly four years ago, Zishe has focused his energy on building his family, and being there for them as a father should. In addition to the time and attention that he invests in his two small children and his wife Zelda, Zishe stives to provide financial stability to his young family as well. *See supra* § II.A.

Zishe had to start over in the wake of this case. And, after several failed attempts to successfully establish a new business, in the last few years, Zishe has been able to establish a web design business. As an entrepreneur, Zishe works hard amidst uncertainty. *See, e.g.,* Ex. C, Moshe

Teitelbaum Ltr. at 2 ("when [Zishe] started his new web development company, he embraced the most difficult tasks he once avoided . . . Zishe now makes cold calls reaching out to potential customers to offer his services, a job that he avoided in the past, and dreaded by most, demonstrating a willingness to face challenges head-on.").  But he knows that he has no other options to support his family—with little formal secular education, Zishe understands that he has few other professional opportunities beyond building something for himself from the ground up.

Finally, and after years of incremental work, and halting progress, Zishe's web design business is beginning to achieve a modicum of financial stability.  *See* PSR ¶ 89.  Several of Zishe's business contacts have written the Court regarding his "empathy and consideration toward his colleagues and clients," and how "[h]e handles every situation with professionalism."  Ex. C, Mac Schlesinger Ltr.  The key to Zishe's success is his care for his clients' needs, and his thoughtful ability to make sure they know he is focused on what is important to them.  *See, e.g.*, Ex. C, David Wagschal Ltr. at 1 ("Beyond his technical abilities, Zishe is someone I can always count on. He is reliable and willing to go the extra mile to get the job done right. When we worked on projects together, he listened attentively to my business needs and goals, asked thoughtful questions, and made valuable suggestions to ensure the website achieved its objectives.").

As one of Zishe's recent clients, Mac Schlesinger describes:

> One of the standout experiences I had with Zishe was when he created a website for one of our companies. From start to finish, it was a pleasure to work with him. His openness and straightforwardness made the whole process smooth and enjoyable. He even went out of his way to add and change things outside of our agreement without any charge, knowing we were on a budget with this project. This kind of generosity and dedication is rare and speaks volumes about his character.

Ex. C, Mac Schlesinger Ltr.

As a business owner, Zishe has also used his position to show kindness to employees.  One colleague, Efraim Wachsman, recalls that:

> During a difficult phase of [their] project, . . . [a] team member faced unexpected personal challenges, causing a drop in performance, and putting important deadlines at risk. While some might have reacted with frustration or impatience, Zishe showed remarkable understanding and patience. Instead of criticizing, he took the time to uncover the reasons behind the underperformance and offered support. His compassionate approach not only relieved the team members of undue stress but also kept the project moving forward.

Ex. C, Efraim Wachsman Ltr.; *accord* Ex. B, Zelda Abraham Ltr. at 3 ("As we heard back from his employees. We never had such a boss who was there to understand the employees' perspective and be considerate of their personal needs. He would send thank-you gifts frequently to express his appreciation and celebrate their family Simchas. Every employee felt a connection to his realness.").

Indeed, in the wake of this criminal case, Zishe thought of his employees first. "Immediately after Zishe was charged, and closed his previous company, he worked diligently to ensure his former employees quickly found new jobs." Ex. C, Moshe Teitelbaum. Ltr. at 1. He knew that his actions had severely hurt others, and that his primary responsibility was "to own up to his mistakes and do everything possible to right his wrongs, taking responsibility for his actions." *Id*. at 2.

In other words, since his criminal case began, Zishe has transformed his view of business. In the last several years he has approached every aspect of his new business with humanity and humility—a marked change from the offense conduct. *See, e.g., id.* ("One instance that highlights this change is when Zishe reached out to me about redoing my company website. I asked for a site with some specific custom forms and calculations, but he declined the job due to his lack of direct experience. ***We both noted the stark contrast to his previous tendency to overpromise, underscoring his newfound commitment to honesty and hard work***.") (emphasis added).

A custodial sentence thus would not only separate Zishe from his family who needs him. It would also interfere with his hard earned financial stability, which depends greatly on his

continued business; a custodial sentence would only hamper the rehabilitation that he has already begun to achieve. *See generally United States v. Bannister*, 786 F. Supp. 2d 617, 674 (E.D.N.Y. 2011) (imposing five-year mandatory minimum, but finding it "excessive" and explaining that "a five-year sentence serves only to diminish his potential for rehabilitation.").

### C.    Zishe's Acceptance of Responsibility and Active Progress Towards Rehabilitation Serve as a Positive Model, Achieving General Deterrence

Nor is a custodial sentence necessary to promote general deterrence. The sentencing statute requires that the Court impose a sentence that is "sufficient, but not greater than necessary," to "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553 (a)(2)(C), (D).

Zishe's risk of recidivism is vanishingly low. Indeed, according to the United States Sentencing Commission's empirical research, individuals like Zishe in Criminal History Category I are less likely to recidivate than virtually any other category of defendant. *See* Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines Release One ("Measuring Recidivism"), at *23 (May 2004).[1] The subset of true "first offenders"—those who, like Zishe, have zero Criminal History points—are even less likely to re-offend. *See id*.

Zishe has also long since ceased any criminal conduct. He truly understands the severity of his mistakes, and changed his life. His only goals now are supporting his family, and investing in his community. Zishe's reorientation of his life since his arrest nearly four years ago is a penological success story that should be touted: if all criminal defendants exhibited a similar transformation following their arrest, our society would be profoundly better off. In other words,

---

[1] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

general deterrence goals are achieved without a custodial sentence.  A custodial sentence would be "greater than necessary," contravening the sentencing statute.

Indeed, while courts frequently justify hefty prison terms as necessary for general deterrence, that is not the case for Zishe.  A harsh sentence would only undermine the proactive steps that Zishe has taken to accept responsibility for his crime, and productively use his time since his arrest to care for his children, support his family, build a new business, and invest his efforts in his community flourishing.  A probationary sentence will provide a positive model for anyone who studies Zishe's case, encouraging voluntary acceptance of responsibility and rewarding sincere contrition, promoting general deterrence.  *See, e.g., United States v. Schonfeld*, No. 19-cr-489 (PKC), Sentencing Tr. 25:16-21, 29:2-16 (Nov. 28, 2022 E.D.N.Y.) (imposing a non-custodial sentence on a defendant with a 47-56 month Guideline based on the 3553(a)'s emphasis on general deterrence and "just punishment": "Section 3553(a) does speak about 'just punishment,' . . . for the offense. I am convinced that the notion of just punishment should take into account or perhaps, more accurately, be [enlightened] by other sentencing factors such as the defendant's post-arrest conduct."  The Court focused on the defendant's extraordinary remorse and rehabilitation post-offense: "I think the defendant's argument has merit that the goal of general deterrence can be served by factoring in a defendant's remorse, rehabilitation and record of leading a law abiding and productive life post arrest. To paraphrase the defense submission, and to place the emphasis somewhat differently, a noncustodial sentence can provide a positive model for anyone who studies a defendant like Mr. Schonfeld's case which encourages personal growth and rehabilitation and that, in turn, serves to promote general deterrence and respect for the law. Defendants in the same situation as Mr. Schonfeld can take away the message from his sentence . . . that making

good use of one's time post arrest and leading a law abiding and productive life will benefit those defendants in the end and at the time of reckoning.").

A non-custodial sentence will also promote "respect for the law."  See 18 U.S.C. § 3553(a)(2)(A).  A recognition that the law is not one-size fits all that promotes punishment above all else is precisely the humanity that a just society seeks in its legal system.  Meting out a sentence that fits not merely the crime, but that fits the person—including the personal remorse, acceptance of responsibility and post-offense conduct—fosters respect for the law as a means of achieving a just society.  That too is a basis for imposing a time served sentence on Zishe.  *See, e.g., United States v. Pizzino,* 419 F. App'x 579, 583-84 (6th Cir. 2011) (sentence vacated where court failed to address defendant's low risk of recidivism and extensive rehabilitation).

## V.    PRIOR TO DETERMINING ANY APPROPRIATE RESTITUTION, THE COURT SHOULD REQUIRE PRODUCTION OF AMAZON'S UNDERLYING RECORDS

The Government seeks restitution of $2,406,692 from Zishe.  *See* Gov. Ltr., ECF Doc. 189, at 4 (June 5, 2024).  That calculation is based on "Amazon's losses from product substitution and price manipulation for just the 48 purchases reflected in the Victim Impact Letter's Exhibit A ($14,292.004.67), [and] counsel fees in connection with the criminal matter ($66,500)."  *Id.* at 3. While Amazon's victim impact letter includes some details regarding the particular order and payments it attributes to Zishe for purposes of restitution, it did not attach or otherwise identify the underlying records reflecting the full details of the orders and payments as is necessary for Zishe to review and, if appropriate, challenge those amounts.  *see also United States v. Sabhnani,* 599 F.3d 215, 257–58 (2d Cir.2010) (defendant must be "given an adequate opportunity to present his position" regarding restitution); *United States v. Gushlak*, 728 F.3d 184, 193 (2d Cir. 2013) ("defendants have a due process interest in paying restitution only for losses actually sustained by victims") (quotation marks and citations omitted).  Nor do the government or Amazon's present

restitution submissions permit the Court to find that Amazon in fact suffered such losses by a preponderance of the evidence. *See, e.g., United States v. Yalincak*, 853 F.3d 629, 637 (2d Cir. 2017) ("any dispute as to the proper amount or type of restitution is to be resolved by the preponderance of the evidence") (quotation marks, citations, and modifications omitted).

Accordingly, prior to adjudicating any restitution award, the Court should order Amazon to produce the complete records underlying its restitution claims, and provide Mr. Abraham with an opportunity to challenge those amounts in accordance with the Mandatory Victims Restitution Act.

## VI.    CONCLUSION

For the reasons stated above, Defendant Zishe Abraham respectfully requests that this Court impose a time served sentence, which would be sufficient but not greater than necessary to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

Dated: June 12, 2024                            Respectfully submitted,
        New York, New York

                                                MEISTER SEELIG & FEIN PLLC

                            By:     _____/S/ IH_____

                                                Henry E. Mazurek
                                                Ilana Haramati
                                                125 Park Avenue, Suite 700
                                                New York, New York 10017
                                                ih@msf-law.com

                                                *Attorneys for Defendant Zishe Abraham*