O9IHAbrS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        20 Cr. 411 (RA)

5   ZISHE ABRAHAM,

6                                         Sentence
                    Defendant.
7   ------------------------------x

8                                         New York, N.Y.
9                                         September 18, 2024
                                          10:05 a.m.
10

11  Before:

12                    HON. RONNIE ABRAMS,

13                                        District Judge

14                         APPEARANCES

15  DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
    BY:  JILAN KAMAL
17      Assistant United States Attorney

18  MEISTER SEELIG & FEIN LLP
        Attorneys for Defendant
19  BY:  ILANA HARAMATI
        HENRY E. MAZUREK
20

21

22

23

24

25
```

O9IHAbrS

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, please, state your name

3    for the record.

4           MS. KAMAL:  Good morning, your Honor.  Jilan Kamal, on

5    behalf of the United States, and also here in court today is an

6    attorney representing the victim, Amazon.  That is Sarah Anne

7    Baugh from the firm of Davis Wright Tremaine.

8           THE COURT:  Good morning to both of you.  I hope

9    you're feeling better.

10          MS. HARAMATI:  Good morning, your Honor.  Ilana

11   Haramati and Henry Mazurek, on behalf of Zishe Abraham, who is

12   seated to my right.

13          THE COURT:  Good morning to all.

14          This matter is on for sentencing.  Mr. Abraham pled

15   guilty in October to the sole count of the superseding

16   information, conspiring to commit wire fraud, in violation of

17   18 United States Code, Section 371.

18          All right.  Let me just confirm that you've received

19   the presentence investigation report; Mr. Abraham's sentencing

20   memorandum; the government's sentencing memorandum dated

21   June 24, September 10, and the 16th; as well as the victim

22   impact statement from Amazon.  Do you all have all of that?

23          MS. HARAMATI:  Yes, your Honor.

24          THE COURT:  Have all been placed on the docket?  If

25   not, I just want to ensure that they are.

O9IHAbrS

1          MS. HARAMATI:  Your Honor, all of the defense

2     submissions have been placed on the docket with some

3     redactions, in accordance with the ECF rules.

4          THE COURT:  All right.  Fine.  Thank you.

5          MS. KAMAL:  With respect to the government's

6     submissions regarding intended loss, which were provided

7     pursuant to the Court's order, the government understood the

8     Court's order to be that those letters were to be provided to

9     the defendants.

10          THE COURT:  OK.

11          MS. KAMAL:  Happy to file them publicly if necessary.

12          THE COURT:  Is there any reason they can't be filed

13     publicly?

14          MS. KAMAL:  No, your Honor.  I simply understood that

15     the Court was directing the parties to basically confer.

16          THE COURT:  Why don't we put those on the record as

17     well.

18          Why don't we begin by discussing the presentence

19     report that, as you all know, is prepared by the probation

20     department.  Counsel, have you reviewed the presentence report

21     and discussed it with your client?

22          MS. HARAMATI:  Yes, Judge.

23          THE COURT:  All right.  Do you have any objections to

24     the presentence report?

25          MS. HARAMATI:  No, your Honor.

O9IHAbrS

| 1 | THE COURT:  All right.  Mr. Abraham, have you had

2  enough time and opportunity to review the presentence report

3  and discuss it with your attorneys?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Does the government have any objections?

6          MS. KAMAL:  No, your Honor.

7          THE COURT:  All right.  I am adopting the factual

8  findings in the report.  The presentence report will be made

9  part of the record in this matter and placed under seal.  If an

10  appeal is taken, counsel on appeal may have access to the

11  sealed report without further application to the Court.

12          Mr. Abraham, when you pled guilty, the federal

13  sentencing guidelines were discussed with you.  Do you remember

14  that?  They're in a book that's like this.  Do you remember

15  that?  Yes.

16          So, as you know, and for all of you who are here that

17  may not know, they are a set of rules.  They're published by

18  the United States Sentencing Commission, and they're designed

19  to guide judges when they impose sentence.  At one time, they

20  were mandatory; meaning judges were required to follow the

21  guidelines.  They're no longer mandatory; meaning the judges

22  don't need to follow them, but they still need to consider them

23  and properly calculate them.

24          So I want to start by confirming —— well, actually,

25  let me back up.

O9IHAbrS

1          So, as I understand it, consistent with the plea

2     agreement, the parties agreed that the guidelines range here is

3     30 to 37 months.  That said, the Court nonetheless has the

4     obligation to independently calculate the guidelines range, as

5     I noted in the order asking for your positions with respect to

6     intended loss.

7          So I'm prepared to rule on intended loss and how I

8     calculate the guidelines.  I will absolutely keep in mind that

9     you have all entered into a plea agreement that you both intend

10    to stick to, but does anyone want to be heard with respect to

11    the intended loss amount or the guidelines calculation beyond

12    what the government put in its letters?

13         MS. HARAMATI:  I do, your Honor, just briefly.

14         THE COURT:  Yes, please.  Sure.

15         MS. HARAMATI:  Look, your Honor, appreciate all of the

16    careful work everybody has done here in order to try to be as

17    precise as possible in coming to a reasonable estimate as

18    required under the guidelines.

19         THE COURT:  Yes.

20         MS. HARAMATI:  In the government's last two

21    submissions, Ms. Kamal calculated that the intended loss is

22    about 3.6 million, which is just a touch over the $3.5 million

23    threshold.  That's the threshold negotiated in the plea

24    agreement.

25         THE COURT:  Right.

O9IHAbrS

1          MS. HARAMATI:  Look, there have been —— that was based

2     on the most recent version of this order and payment

3     spreadsheet that Amazon, I guess, produced to the government.

4     In the course of the four years of this litigation, we've

5     received a lot of versions of this spreadsheet, of other

6     spreadsheets, and because the guidelines only require a

7     reasonable estimate and not exact precision, and looking at the

8     different versions of the spreadsheets, it's very difficult ——

9     I sort of think it's impossible, given what I know about these

10    spreadsheets —— to say with certainty that every order, every

11    legitimate order, is in any given one of the spreadsheets,

12    given the myriad of different sources of information we've

13    received over the last four years.

14          So I think that, because the guidelines only require a

15    reasonable estimate and given what I know about the imprecision

16    of any one of these spreadsheets, I think Mr. Abraham should

17    get the benefit of the doubt on the question of whether, you

18    know, is the intended loss just over the $3.5 million

19    threshold?  Is it just under the $3.5 million threshold?  Since

20    we're so close to that threshold, I think a reasonable estimate

21    would be a 16-point enhancement, 1 1/2 to 3 1/2 rather than the

22    above $3.5 million threshold that the government put in its

23    letter.

24          THE COURT:  I don't disagree with you if I'm analyzing

25    this in terms of the 3553(a) factors, but I do have this

O9IHAbrS

1     obligation to independently calculate the guidelines, and I do

2     agree that the government's calculation, consistent with

3     Exhibit 4, is reasonable.  So I'm going to read my ruling on

4     that, but I'm going to consider not only your argument but also

5     the fact that, as I noted earlier, the parties stipulated to

6     the lower guidelines range as part of the plea agreement, and

7     that will be a big factor that I consider when balancing the

8     factors.

9            Let me ask you this:  Are you objecting to my reliance

10    on intended loss?  Do you want me to make a ruling on that?

11           MS. HARAMATI:  Look, your Honor, I know that you've

12    already considered this in the context of Yoel Abraham's

13    sentencing.

14           THE COURT:  Yes.

15           MS. HARAMATI:  The reason that the parties agreed to

16    use gain as opposed to loss, intended loss or actual loss, is

17    exactly because of the imprecision of these spreadsheets.  So

18    to the extent that that, I think, persists to this day, I would

19    just respectfully disagree that intended loss is the right

20    measure, and I think the gain, the alternate means of the gain,

21    is the more correct measure, just because of the same

22    imprecision that I just raised.

23           THE COURT:  Does the government want to be heard at

24    all?

25           MS. KAMAL:  Just very briefly, your Honor.

O9IHAbrS

1          As you noted from the outset, the government stands by

2    the guidelines analysis and the guidelines range set forth in

3    the plea agreement.  One thing that I just think might help the

4    record and the Court to understand here is that the calculation

5    of the gain and the parties' use of the gain to basically

6    negotiate the plea agreements reflected, fair to say, the

7    knowledge of the parties and the victim at a moment in time.

8    And while it is certainly true, as defense counsel points out,

9    that there are multiple spreadsheets that contain relevant

10   information to calculating gain and loss, there is no single

11   spreadsheet that contains the world of data that the Court or

12   the parties might consider.

13          I don't think it is fair to say that the spreadsheets

14   themselves are imprecise.  With respect to Exhibit 4, which the

15   Court relied on in calculating the intended loss for defendant

16   Yoel Abraham, the parties until very recently were operating

17   from the one version of that spreadsheet ever produced.  And as

18   the Court is aware, in the government's most recent letter, the

19   government recently learned that some data for another

20   defendant, not Zishe Abraham, had been omitted, but other than

21   that, there's only been two versions of that spreadsheet in the

22   pendency of this matter.

23          So, respectfully, I disagree with counsel when she

24   says that the spreadsheets themselves as a factual matter are

25   imprecise and that as a factual can't be relied on to calculate

O9IHAbrS

the gain here.  Now, if defense counsel has an argument about

the propriety of using intended verses actual loss generally,

the Court's already ruled, and the Court knows the government's

position there.  I just want to make sure that record's clear

on that point.

THE COURT:  I do find Exhibit 4 to be reliable with

respect to defendant's intended loss.  I'm going to read a

ruling with respect to intended loss so the record is clear,

but, again, I'm going to consider your argument and, as I

noted, your agreement and the plea agreement when I ultimately

sentence Mr. Abraham.

So beginning with the loss enhancement, I find it is

appropriate to use the intended loss amount.  Pursuant to

2B1.1, the defendant's offense level is increased where loss

exceeds certain enumerated figures.  The commentary to 2B1.1

explains that loss is the greater of actual loss or intended

loss.  Indeed, where the intended loss is greater than actual

loss, the larger intended loss is a better measure for the

defendant's culpability than is the actual loss.  The Second

Circuit, moreover, recently clarified that it continues to

defer to the loss application note even after the Supreme

Court's decision in *Kisor v. Wilke*, and that's in the *Rainford*

case.

Intended loss means the pecuniary harm that the

defendant purposely sought to inflict.  That's application note

O9IHAbrS

3(A)(ii) to 2B1.1, and it includes intended pecuniary harm that
would have been impossible.

A district court's factual findings relating to loss
must be established by a preponderance of the evidence.
Accordingly, the Court's findings must be grounded in the
evidence and not derived from mere speculation.  Such evidence
need not, however, establish loss with absolute precision.  It
need only permit the district court to make a reasonable
estimate of the loss given the available information.

If the loss reasonably cannot be determined, the
commentary to 2B1.1 provides that the Court shall use the gain
that resulted from the offense as an alternative measure of
loss.  Although the parties agreed in the plea agreement that
loss to the victim reasonably could not be determined, as I
said, I disagree.  I've reviewed the materials in this case.  I
find the Government Exhibit 4 is reliable.  The Second Circuit
has held that a district court may make a reasonable estimate
by extrapolating the average amount of loss from known data and
applying that average to transactions where the exact amount of
loss is unknown.  Here, I find that using Exhibit 4 to
determine intended loss is more precise than extrapolating the
average amounts of loss.

In particular, Exhibit 4 reflects the amount of goods
Amazon originally ordered from defendant, the amount of goods
that defendant shipped, and the cost differential, which is

O9IHAbrS

1  calculated by subtracting the amount Amazon ordered from the

2  amount that the defendant shipped.  The commentary to the

3  guidelines provides that the loss amount should be reduced by

4  credits against loss, which include services rendered by the

5  defendant to the victim before the offense was detected.  I

6  find that subtracting the amount of goods Amazon ordered from

7  the amount shipped provides credits for the services rendered.

8       However, I don't find any other credits to be

9  appropriate here.  *See*, for example, the *Mitan* case, in which

10  the Third Circuit held that perpetrators of fraudulent schemes

11  are not entitled to credits against loss for payments that were

12  made to perpetuate their schemes.  I'll note that Exhibit 4

13  does not take into account what Amazon actually paid the

14  defendant.  So although I find it to be reliable with respect

15  to defendant's intended loss, I'm not relying on it to show

16  actual losses.

17       I'll also note that the Excel sheet takes into account

18  instances where defendant shipped less than the ordered amount.

19  This actually works in defendant's favor given that these

20  instances were to decrease the overall cost differential.  The

21  total cost to Amazon comes to $3,618,304.87.  I find by a

22  preponderance of the evidence that this figure is a reasonable

23  estimate of defendant's intended loss.

24       With regard to the remaining guidelines calculation, I

25  agree with the plea agreement.  I'll thus summarize my

O9IHAbrS

guidelines calculation.

So the base offense level is 6 pursuant to 2B1.1(a)(2). Defendant's intended loss is just over the $3.5 million threshold, as I just noted, so the level is increased by 18 pursuant to 2B1.1(b)(1)(J). I agree with the parties that the offense involved sophisticated means, and so the offense level is further increased by 2, pursuant to 2B1.1(b)(2). The offense level is then decreased by 2 pursuant to 4C1.1 and further decreased by 3 pursuant to 3E1.1(a) and (b). So thus the total offense level is 21.

With regard to the defendant's criminal history, he has no criminal history points. He thus has a criminal history of I. So, for those reasons, I find that his offense level's 21, his criminal history category is I, and his recommended guideline sentence is 37 to 46 months. So, as I said, I'm cognizant that in the plea agreement the parties agreed to the lower range of 30 to 37 months, and I'm going to take that into account.

In any event, the range is only advisory, so courts can impose a sentence outside of that range based on one of two legal concepts: a departure or a variance. A departure allows for a sentence outside of the advisory range based on some provisions in the guidelines themselves. In the plea agreement, both parties agree that no departure from the guidelines range was warranted, but I have of course found a

O9IHAbrS

1    slightly higher guidelines range.

2          So, just to be clear, neither side is seeking a

3    departure, although Mr. Abraham is seeking a variance pursuant

4    to 3553(a).  Is that correct?

5          MS. HARAMATI:  Yes, your Honor.

6          THE COURT:  In any event, I have considered whether

7    there's an appropriate basis for departure from the advisory

8    range within the guideline system, and while recognizing that I

9    have the authority to depart, I don't find any grounds

10   warranting departure.  I also have the power to impose a

11   non-guidelines sentence based on what we call a variance, and

12   as I said a moment ago, I'm going to take your plea agreement

13   into account as well as all the other factors that we'll talk

14   about shortly.

15         So, first, does the government wish to be heard with

16   respect to sentencing?

17         MS. KAMAL:  Briefly, your Honor, although I am largely

18   ready to rely on the rather substantial submission that's

19   already been provided to the Court.

20         As the Court has recognized in the sentencing of

21   Mr. Abraham's codefendant, this was not a one-off offense.  It

22   was pervasive, it was of long-standing, and the defendants were

23   persistent.  The text messages between Mr. Abraham and his

24   codefendants reveal that the intent here was simple:  To bilk

25   Amazon for as much money as the defendants could as quickly as

O9IHAbrS

1    they could without, quite frankly, any — without any real care

2    for the impact.

3            That said, in reviewing those text messages, the

4    government can't help but to notice the difference in attitudes

5    and commentary by the various defendants.  And here, as noted

6    in the government's submission, Mr. Zishe Abraham did evince

7    uneasiness with the scheme.  To be clear, he continued to

8    pursue it.  He did so with energy and creativity, but —

9            THE COURT:  It suggests he's less likely to recidivate

10   because he realizes the severity of his conduct.

11           MS. KAMAL:  Precisely, your Honor.

12           With respect to specific deterrence, here, the

13   government would submit that, relative to his codefendant,

14   Mr. Yoel Abraham, the sentence has less of a need to

15   specifically defer Mr. Zishe Abraham.  That said, the

16   government's arguments regarding general deterrence bear out.

17   It was a scheme of long duration, it created considerable harm,

18   and as reflected in the intended loss here, it was a serious

19   offense that warrants a sentence of imprisonment.

20           With respect to the 3553(a) factors, the government

21   can only observe what it observed also with respect to Mr. Yoel

22   Abraham.  Mr. Zishe, throughout both the offense and since

23   appears to be remarkably dedicated to his family and to his

24   community.  Those are wonderful supports and great direction

25   for his energy, but his good works in the community and his

O9IHAbrS

1    support of his family were bearing on him during the offense

2    and still do now.  And the government submits that that alone

3    should not mitigate or support the conclusion that a

4    non-incarceratory sentence is appropriate here.  The government

5    submits that it is not.

6              But unless the Court has specific questions ——

7              THE COURT:  I just want to ask one question about

8    relative culpability to avoid unwarranted sentencing

9    disparities.  So I understand he is the second to lowest in

10   terms of the intended loss amount if we're looking at that,

11   right?

12             MS. KAMAL:  That's correct, your Honor.

13             THE COURT:  But as you just noted —— and I appreciate

14   the government recognizing this and highlighting it —— not only

15   does he feel genuinely remorseful now, but he had that unease

16   when he was engaging in this conduct, which I do think bears on

17   the likelihood of recidivism to his favor.

18             Are there any other factors you think I should

19   consider with respect to relative culpability between the four?

20             MS. KAMAL:  I think, with respect to the offense

21   conduct, Mr. Zishe Abraham's overwhelming misconduct considered

22   overshipping but also unit manipulation.  And as the Court's

23   aware, but I will make clear for the record here, there were

24   various flavors of deceptive practices here.  There was

25   substituting the product actually ordered for an entirely

O9IHAbrS

1    different product of lower value.  There was fulfilling the

2    order with the product that had been ordered but manipulating

3    how that product was packaged.  So if Amazon had ordered ten

4    widgets for $10, instead manipulating the product pages so that

5    the defendants were shipping to Amazon one widget for $10 and

6    then overshipping that as well.  Then, finally, there was just

7    pure overshipping, which was accomplished in many different

8    ways, but didn't involve either unit or product substitution.

9          It bears noting that Mr. Zishe Abraham did not engage

10   in what was probably the worst version of the offense conduct

11   here.  He didn't engage in the wholesale product substitution

12   that we saw with respect ⸺ that was chiefly characterized,

13   frankly, by Mr. Yoel Abraham's conduct.  He did engage in unit

14   manipulation to a significant extent, as reflected in the

15   victim impact statement.  But with respect to his offense

16   conduct, I think it does bear noting that he didn't go to the

17   max, so to speak, when it came to his efforts to defraud the

18   company.

19         THE COURT:  How do you view him in terms of relative

20   culpability relative to Heshl, for example?

21         MS. KAMAL:  They are similarly situated, I would say,

22   your Honor.  It would be hard based ⸺ the main distinguishing

23   characteristic, I would say, between Mr. Heshl Abraham and

24   Mr. Zishe Abraham would be the attitudes and their intent

25   reflected in the text messages, at least from the government's

O9IHAbrS

 1    point of view.  I want to say, without misspeaking, that they

 2    are fairly close when it comes to their intended loss figures,

 3    but I want to say that Mr. Zishe Abraham's intent, as reflected

 4    in his discussions with his codefendants, evinces less of a

 5    likelihood to engage in this conduct again in the future.

 6            THE COURT:  Lastly, I understand that there's a

 7    representative of Amazon here.  I read the letter, of course,

 8    but would she like to be heard today?

 9            MS. KAMAL:  No, your Honor, unless there are specific

10    questions.

11            THE COURT:  No, I don't think so.  Thank you.

12            All right.  Ms. Haramati, would you like to be heard?

13            MS. HARAMATI:  Yes, Judge.  Thank you.

14            Your Honor, apart from the offense conduct that the

15    government just addressed, the Court ⸺ obviously, the Court

16    knows this better than I do ⸺ has to consider many factors to

17    determine what's a sufficient but not greater than necessary

18    sentence for Zishe Abraham, not just for the crime that he

19    committed but for the person that he is and, frankly, the

20    person that he has become in the last five or six years since

21    the offense conduct ended, which is a really long period of

22    time in his adult life.  He was 26 years old at the time of the

23    offense.  He's now the father of two children.  He has myriad

24    family responsibilities.

25            Looking at the 3553(a) factors beyond the offense

O9IHAbrS

conduct itself, the most important factor that I want to

address is his personal history and characteristics, especially

how he has conducted himself and how he has reoriented his

entire life in the last several years, and these are not just,

as Ms. Kamal said, good works in the community.  It's really a

total shift in focus and who he is and what he prioritizes in

his life.

What I think is clear —— and I want to put a little

bit of more detail in this —— what I think is clear from his

record over the last five-plus years is that his conduct these

last several years, his life reorientation, show that he's

already met most or all of the sentencing goals enumerated in

Section 3553(a).  He has rehabilitated himself.  That goes to

specific deterrence.  He has accepted responsibility, he has

accepted social opprobrium, and he has built a law-abiding and

respectful life for himself since ceasing the offense conduct.

And I think that all that Zishe has achieved —— and I want to

give a little detail on each of these themes —— all that Zishe

has achieved really demonstrates that a time-served sentence is

really all that is necessary for this person who has stood

before this Court over the last four years, facing his criminal

conduct, and taken real concrete strides to make his life

totally different than what it was at the time of the offense

conduct.

Zishe has expressed remorse.  The Court, I think, saw

O9IHAbrS

1    that in his letter that we submitted along with his sentencing

2    memo, and I anticipate that your Honor will hear from him

3    directly today to understand the depth of his remorse.  But

4    it's not just words for him; it's a track record for what he

5    has done.  That makes Zishe a positive role model.  His conduct

6    is an example for what people in his position, people who have

7    made mistakes and accepted responsibility for those mistakes,

8    what we as a society want people in his position to do.  So I

9    think that, beyond just giving him credit or mitigation, I

10   think that his track record and what that reflects and how we

11   as a society should promote doing what Zishe has done also goes

12   to general deterrence and respect for the law.  Because people

13   looking at Zishe can see a model for how to act after

14   committing an offense and how to make real progress — and how

15   that will, frankly, inure to a person's benefit if that is

16   considered at the time of sentencing — I think promotes that

17   sort of positive rehabilitation in a way that a harsh custodial

18   sentence really does not.

19            So Zishe has invested in really three things, and I

20   want to spend a little bit of time elaborating on what those

21   three things are.  The first and foremost is that he has just

22   poured his energy and his attention into his family.  Your

23   Honor, Zishe has two young children:  Devory, who's 6, and

24   Shimon, who is 4.  Zishe's wife, Zeldy, who is here in court

25   today along with a number of family members — her mother, many

O9IHAbrS

1    of Zeldy's brothers are here, some of Zishe's family members

2    are here, community members are here — and both Zeldy and

3    family members, as well as neighbors and community members,

4    remark in their letters to the Court and provide illustrations

5    not just that Zishe is a good father, he's really a superlative

6    father.  He's the kind of father who gives special gentle care

7    to each of his children individually, and you can see from the

8    anecdotes in the letters how Mr. Abraham's children rely on him

9    for that.  They don't take it for granted.  They wait for him

10   at the windowsill every single day when they think he's coming

11   home from work because they know that they can rely that their

12   father will be there every single day at the same time to help

13   them with their homework, to get them ready for bed.  And he

14   relishes that time with them.  He spends time with them in

15   their daily routines in the kind of way that is just

16   irreplaceable.

17            We have what I think is notable.  It's not just that

18   the family members discuss Zishe's family commitment, but

19   Zishe's business associates also remark in their letters about

20   his family commitments.  They note that he makes his work

21   schedule around his family commitments, not the other way

22   around.  He tells people:  I can't come to that late meeting.

23   I got to go home to my kids.  They're waiting for me.

24            One of his business associates, Pinchas Braver, he

25   wrote in his letter what I think is a prime example of this.

O9IHAbrS

1    He told the Court:

2         "One evening I knew that Zishe was in the middle of an

3    important project and I noticed that Zishe left at the same

4    time as he did every other day, so I asked him where was he

5    going.  Zishe told me he needed to go home because his kids

6    were waiting at the window looking out for him, and it was

7    clear that he really cares about his kids and didn't want to

8    keep them waiting."

9         Zishe is a real father, and he's the kind of father

10   who, if he were absent from his children's lives, even for a

11   small amount of time, would create a palpable void in their

12   young lives.

13        He's also a fantastic husband and a fantastic partner

14   to his wife Zeldy.  They share their family responsibilities.

15   There's no primary parent in the Abraham house.  Zishe and

16   Zeldy work together to give their all to both of their children

17   every single day.

18        And Zishe is the kind of husband who also

19   independently encourages his wife to pursue her own goals.  She

20   wrote the Court about how she recently completed training as a

21   head start teacher, and now she is also able to independently

22   achieve the kinds of professional success and give back to the

23   community through her profession in a way that she wouldn't be

24   able to without Zishe's encouragement and, frankly, without his

25   partnership in their home.  He does grocery shopping.  He does

O9IHAbrS

the bills.  He's there every single day just to split the home
responsibilities so that they can each independently thrive in
their own lives while giving the kind of care to their children
that the kids need.  Zeldy is really clear with the Court in
her letter.  She doesn't know how she would cope if Zishe
wasn't around with all of the responsibilities that she has.
Zishe is just — he's the linchpin of his home.

            Especially because so many of Zeldy's family members
are here, including, I think, most notably, her elderly mother
Esther Altman who wrote a really, I think, beautiful and kind
of unusual sort of letter to the Court about how much Zishe
really takes care of her, especially in the last couple of
years since — since 2019 and the pandemic, she's had a number
of health issues, and each and every time Zishe doesn't just
send food or call or come visit, he opens his home to her.  He
reorganizes his home so that if she has trouble walking — she
tells of a time that she had surgery in 2019 where she couldn't
walk.  And she lives in a building with a number of flights of
stairs, so she came to Zishe and Zeldy's home.  They
reorganized their entire downstairs so that way she could have
a place on the main floor without having to go up any stairs,
not too far from the shower, so that her needs were primary for
Zishe.

            And the same thing after she was on a respirator in
2020 during the COVID pandemic.  He took her into his home

O9IHAbrS

happily, you know, for months, and he's done the same thing
with her over and over again.  So it's not just kind of a light
sort of in-law relationship.  He has invested himself in the
care in the last few years, I think particularly since the time
the offense conduct ended.  That's by virtue of his
reorientation of his life and also by virtue of the fact that,
since then, I think Zishe has really grown into the
responsibilities that have faced him, and he has met the
challenge.  He's kind of the quintessential "sandwich
generation" that we hear a lot about — the person who's caring
for the children and caring for elderly family members — and
he has stepped into those responsibilities in the last few
years in a big way.

        And it's not just he's been devoted to his family the
entire time, including during the time of the offense conduct.
His family needs him a lot more than it did five years ago, six
years ago, seven years ago, at the time of the offense conduct,
and he has met the moment, and he has invested himself in a way
that, frankly, takes up a lot of his time and a lot of his
energy.  And he does it with the kind of joy that I think we
would all hope that any of our family members would do if we
faced the kinds of needs that Zishe's family members have.

        Looking at what else Zishe has done in the last five
or six years, he has really taken a big step to invest in his
community.  It's true that he comes from a close-knit

O9IHAbrS

community, many friends, and he was an active participant.  But
what Zishe has done in the last just few years, I think, goes
well beyond what he ever did when he was a younger man.  Most
notably, I'll say, is the —— this past year Zishe took an EMT
certification course.  It's not for any social opprobrium or
approbation, not for any praise in the community.  He was in
the synagogue, and he noticed there are no EMTs in his
synagogue.  You never know what's going to happen in a
gathering place, so he took it upon himself to invest hundreds
of hours into this EMT course so that he could be there if
somebody in his community needed him.

          His EMT instructor wrote, I think, a really
extraordinary letter that told the Court not just that Zishe
was there to get a check mark, that he got his certification.
He brought his everything to that EMT course to make sure that,
when he was faced with life or death situations that EMTs face,
that he was really prepared.  The EMT instructor, whose name is
Elazar Massarano told the Court Zishe was one of the top
performing students.  From the first day, he stood out as a
student who came to class to learn and to participate.  He
attended every class.  He was not cutting any corners.  He
always came prepared because he wanted to be prepared for the
real challenges that he's going to face when he's able to give
back to the community as an EMT.

          He even devoted extra time because, understanding the

O9IHAbrS

importance of this work, he devoted extra time to help with the
struggling students, one of whom wrote a letter to the Court
and really credits —— that letter-writer friend of Zishe's
really credits his ability to succeed in the course to gain his
certification to the help that Zishe gave him.  So, you know, a
man with two young children and a full-time job and a lot of
responsibilities taking on this additional responsibility in
order to be able to put himself in the position to help his
community all the more, took that extra time to make sure that
other people who also wanted to give back were able to do so if
they needed that little extra help, a little extra time
studying, or things didn't come as easily to them.

          I'll just note, in terms of what Zishe wants to do
with this certification, he's applied to volunteer with a
volunteer ambulance EMT organization, Hatzalah in Rockland
County.  They have put his application in abeyance pending the
outcome of this case, but it's clear, just by the fact that
Zishe not only pursued it but he's actually trying to sign up
for a volunteer position, which I think is understandably
difficult for a person with a pending criminal charge, but he
has put that aside.  He wrote letters to them explaining the
conduct in this criminal case.  He's openly discussed with them
this case and accepted the shame of doing that, even as he's
trying to put himself in a position to do something —— to do
something good for his community.  I think that that is a

O9IHAbrS

1    really noteworthy thing that Zishe has done just in the last

2    year or so.

3            And the same is true of Zishe's work founding a

4    synagogue.  The synagogue's in Zishe's Hasidic community, it's

5    not just a place of worship.  It's not just a place people go

6    once a week or every once in a while in order to pray.  It's

7    really the hub of community life.  It's a place where people

8    make friends.  It's the place where people go for advice.  It's

9    the place where people go for help if they need it in the

10    community.  It's really the center of the community life.  And

11    when Zishe moved to his neighborhood where he lives in Rockland

12    County, he noticed that there was a big void.  There was no

13    local synagogue in that particular neighborhood.

14            So rather than looking to somebody else to take on the

15    hard work of starting one, he himself took on the obligation of

16    trying to found this sort of community center where he and the

17    other — his neighbors could go in order to seek that sort of

18    social network and social support that comes with a synagogue.

19    And he worked, not just to found the synagogue, he imbued it

20    with a kind of ethos of openness.  Some of the letter writers,

21    I think the rabbi of the synagogue who's here in court today to

22    support Zishe, wrote to the Court about how Zishe insisted that

23    this would be a synagogue that doesn't require membership dues,

24    which is very uncommon, so that way everybody would feel

25    welcome.  There wouldn't be a kind of barrier of can I afford

O9IHAbrS

1    to really fully participate in this community?

2            And Zishe has already continued to foster a welcoming

3    and warm place in this synagogue.  He has taken on the

4    volunteer position of coordinating the different prayer

5    positions and coordinating some of the charitable

6    contributions, which he does discreetly, and he also does just

7    because he knows how important it is having been the recipient

8    of community support at the time of this case.  He personally

9    knows how important it is to have that community that's willing

10   to be your safety net when you need it most.

11           He has used the lessons that he's learned since the

12   offense conduct ended and since his indictment in order to

13   foster a more positive and welcoming and supportive place for

14   other people in his community.  So I think those lessons are

15   really deeply learned within him, just in the last few years,

16   and he's put them to work.

17           Finally, the other, I think, really notable thing that

18   Zishe has done since the offense conduct, since he stopped the

19   offense conduct, is that he also stopped looking for shortcuts

20   in the business world.  He has worked very hard in the last

21   several years to establish a legitimate business that's just

22   showing signs of real stability.  He, obviously, had to start

23   over.  His time selling for Amazon in any capacity, which is

24   what he did before the offense conduct.  He previously had been

25   just a seller on Amazon.  You know, you order toothpaste from

O9IHAbrS

1    this third party that —— the buyer buys it directly from the

2    third-party seller, that had been his prior business, and then

3    the offense conduct occurred, and he totally shifted his focus

4    into a different kind of business and invested himself into

5    making —— building a legitimate web design business, so

6    something totally different than what he was doing before.

7            And what his customers and community members who have

8    interacted with him in the business world noted in their

9    letters to the Court is that his entire attitude is different

10   in this business.  He is trying to build things from the ground

11   up, hustling to find customers who need his services, providing

12   exceptional customer service to them, really meeting their

13   needs, doing the hard work of building a real business that is

14   now only finally beginning to achieve a modicum of financial

15   stability, which I think that is something for the Court to

16   consider in two ways:  First, obviously, taking him away from

17   that business and that financial position that he's now trying

18   to build for his family would, obviously, be very disruptive in

19   terms of his family's financial ability to cope financially,

20   but also I think what he has done in his business shows how he

21   has transformed his life, how he has really changed over the

22   last several years.

23           Judge, all the while during this entire time frame,

24   while he's taking care of his family, while he's investing in

25   his community, while he's building his business, the other

O9IHAbrS

1    thing that Zishe has done that I think is really remarkable is

2    how he has openly accepted responsibility for his crime.  He

3    has emphasized to anyone who will listen to him — his friends,

4    his neighbors, his community members, his business associates

5    — that his actions, what he did in this case, are a real

6    cautionary tale of what not to do in business.

7          THE COURT:  Let me stop you there.  I don't have

8    reason to disagree with anything you have said thus far, but

9    when you talk about a cautionary tale, right, as that relates

10   to deterrence, what kind of message would I be sending for

11   someone who is involved in defrauding a company of millions of

12   dollars — and not just over the course of a week or a month,

13   but years — what kind of message would I be sending to give

14   that person, as good a person as he may be and as good a

15   community member and husband and father — and, again, I don't

16   doubt any of that — but what kind of message would I be

17   sending if I give a non-incarceratory sentence?

18         MS. HARAMATI:  Your Honor, I think that there is

19   something really to be said for the fact that Mr. Abraham has

20   internalized the gravity of his mistakes in a way that's

21   concrete.  It's not just that he said "I'm sorry."  It's that

22   — the offense conduct lasted, as far as I can tell,

23   approximately ten months based on the data and the spreadsheets

24   that we have gotten over the years, and he has taken the

25   positive steps, changed his life affirmatively over the last, I

O9IHAbrS

1    don't know, five or six years.

2           So I think that the message that the Court would send

3    is that you can do something bad; you have to repay for your

4    actions.  He has a felony for the rest of his life that is

5    going to be a black mark on him.  He has a giant forfeiture

6    judgment.  I expect he's going to have an equally giant

7    restitution judgment.  He has faced criminal prosecution over

8    the last four years, but I think that giving him ⸺ giving him

9    real credit for what he has done since shows that you can be a

10   positive model; that what you did in the past does not

11   necessarily determine your future.  It gives people in his

12   position, criminal defendants, a real incentive to change their

13   life affirmatively and not just wait for the court to give them

14   a smack and tell them, sorry, you did bad.  It gives people an

15   incentive to invest in themselves, to invest in their

16   community, to invest in their family, in order to build a new

17   life for themselves, knowing that that is the kind of thing

18   that we as a society want criminal defendants in Zishe's

19   position to do.

20          Your Honor, I cited this in our sentencing memo, but I

21   think that the way that Judge Chen in the Eastern District put

22   this in *United States v. Akiva Schonfeld*, which we quoted on

23   pages 24 and 25 of our sentencing memo, I think that she

24   distilled it in a really perfect way.  What she said is "goal

25   of general deterrence can be served by factoring in a

O9IHAbrS

defendant's remorse, rehabilitation, and record of leading a

law-abiding and productive life postarrest."  Defendants in the

same situation can take away the message from Mr. Schonfeld's

noncustodial sentence "that making good use of one's time

postarrest and leading a law-abiding and productive life will

benefit tho se defendants in the end and at the time of

reckoning."

    I think Zishe Abraham is in exactly the same position

as that defendant.  He has used his time productively, and I

think that giving him the credit that is due for the work that

he has done over the last five, six years shows a positive

model of deterrence.  It shows you don't necessarily need a

harsh punishment in order to achieve deterrence.  If a person

achieves deterrence in their own right by investing in

themselves, by getting on the straight and narrow, but taking

concrete steps, then that is what we want to do, and you won't

necessarily receive the same punishment.  It's not just, you

know, a mitigating factor.  I think that it shows that his

conduct has achieved the goals of federal sentencing.

    So, for that reason I, think he's achieved specific

deterrence.  He has achieved rehabilitation.  I think he's

achieved respect for the law.  Because having the law be

something that really considers a person where they are on the

day of sentencing, that also promotes respect for the law.

That it's not just a one size fits all and one-way ratchet for

O9IHAbrS

1    punishment promotes a real respect for the law as a humane

2    institution.

3           So I think that, for all of the reasons given and what

4    Mr. Abraham has done with his life over the last several years,

5    a noncustodial sentence, a time-served sentence is the right

6    sentence, is what is no greater than necessary for this person

7    who is coming before the Court today, not four years ago, not

8    five years ago, and not six years ago.

9           THE COURT:  Thanks very much.  Thank you.

10          I just want to turn back to the government for a

11   minute.  Is the course of conduct just about ten months?

12          MS. KAMAL:  Your Honor, I wish that I had today with

13   me my laptop so I could be looking at that spreadsheet with the

14   Court.  I don't have that because my laptop is in the

15   possession of the United States Attorney's Office's IT

16   department.

17          THE COURT:  OK.

18          MS. KAMAL:  I want to say, your Honor, that there are

19   text messages that predate 2018 with respect to Mr. Zishe

20   Abraham.  Unfortunately, I do not have that in front of me

21   here.  But it is correct, if the Court is thinking about

22   relative culpability, that in their conversations, Mr. Yoel

23   Abraham held himself out as the person who had been doing this

24   the longest, who had been doing this for six years.  There is

25   not the same representations made by Mr. Zishe Abraham, so he

O9IHAbrS

1  does not say I have been doing this for —— I have been doing

2  this for many years.

3        I do know that he and the other codefendants all

4  talked about different ways they had evolved their deceptive

5  practices over time.  And especially with respect to the fact

6  that Mr. Zishe Abraham engaged in product substitution so much,

7  that may be a source of determining when his offense conduct

8  began, but it is true that, based on the samples set forth in

9  the victim impact statement, that the bulk of his conduct was

10 in, I want to say, 2018, but as early as sort of December of

11 2017.

12        THE COURT:  Thank you.

13        MS. KAMAL:  That's my memory, without having the ——

14        THE COURT:  A couple months isn't going to make the

15 difference for me.  I wanted to make sure I had a full

16 appreciation of all the facts.

17        MS. KAMAL:  Yes, there's not the same representation

18 that was made from the defendant's own mouth, so to speak,

19 which was the case with Mr. Yoel Abraham.

20        THE COURT:  Yes, Mr. Haramati.

21        MS. HARAMATI:  I just want to give the Court an idea

22 of where I got the ten-month number from.  The same spreadsheet

23 that we've been using to calculate the intended loss, I'm just

24 looking at the overage, the overage shipments that are used for

25 the intended loss, and it looks to me that the first

O9IHAbrS

1    overshipping was November 2017 and the last one was

2    September 2018.  So that's, I think, at least the rough time

3    frame.  So when you compare that to the last five or six years,

4    I think that that's the important metric.  Whether it's a day

5    here or a day there, I don't think makes much of a difference.

6              THE COURT:  Understood.  Thank you.

7              Mr. Abraham, is there anything you'd like to say

8    today?

9              THE DEFENDANT:  Yes.  Judge Abrams, I come before you

10   today feeling so ashamed.

11             THE COURT:  I'm sorry.  If you can, just speak really

12   loudly and clearly and slowly, just so we can all hear you.

13   Thank you.

14             THE DEFENDANT:  I come before you today feeling so

15   ashamed by my crimes and the position I put my family in.  It

16   is hard for me to think about how my actions jeopardized my

17   family's future.  I have two sweet and young children, Devory

18   and Shimon.  Devory is 6 and Shimon is 4.  They are my whole

19   world.

20             And I have the best wife, Zeldy.  Zeldy gives the

21   children all the sweetness and attention that the mother can.

22   She has a heart of gold, but she can't do everything in her

23   own.  She works hard with children with behavioral issues.  She

24   can't do everything for everyone.  There just are not enough

25   hours in the day for Zeldy to do her job so well and also care

O9IHAbrS

1    for young children without help.

2            Since we were blessed to become parents, Zeldy and I

3    have always shared our responsibilities as parents of two young

4    kids.  I feel fortunate that I have the chance to be there to

5    take care of my kids every day.  Every morning when they wake

6    up, it is my job to get them ready to school.  I love hearing

7    about what they are looking forward to each day.  I make sure

8    to come home on time every day because I know that the two kids

9    will be waiting for me.  The kids want to tell me about their

10   friends and review their school lessons together.

11           I try to make even chores and lessons a positive

12   experience for the kids.  I make a point to share with

13   attention and love the lessons that are learned in a hard and

14   painful way so that they can have a positive view of life, grow

15   up healthy, and develop emotionally.  When I'm not working or

16   participating in community events, I'm with the kids.  We have

17   so much fun together just singing songs and talking about

18   whatever the children are thinking about that day.  My son,

19   Shimon, who is four, loves to tell me about his friends at

20   school and what activities they do.  And Devory is growing into

21   such a sweet little girl, full of curiosity and creativity.

22           Being with them and helping them grow and develop each

23   day is my dream.  My children are the light of my life.  They

24   are a lot of work, but to me, raising my kids is the most

25   meaningful work I can do with my life.

O9IHAbrS

1          Your Honor, I am not here to make excuses.  I did not

2   —— I know I did wrong.  I know I deserve punishment for my

3   crime.  I should never have taken advantage of Amazon and taken

4   what is not mine.  I'm so sorry for my actions.  Honestly, I'm

5   scared, though.  I spend my nights laying awake worrying that

6   Zeldy won't be able to manage everything on her own —— the

7   kids, the house, the bills, and all of the responsibilities.

8   It's just too much for one person.  Zeldy doesn't have too much

9   of a support system other than me.  I can't stand to think

10  that, because of what I did, no one will be there for Zeldy and

11  our precious children.

12          Since the terrible mistake I made with my Amazon

13  business, I've worked hard to build my new website design

14  business.  After years of struggling to get it off the ground,

15  I finally have few steady clients and will make just enough

16  money with Zeldy's salary that we can pay our bills on time and

17  care for Devory and Shimon without panicking at the end of

18  every month like we did for a number of years.

19          I feel terrible beyond description that I risked

20  everything.  I risked my kids' stability and their future by my

21  own crimes.  All I hope is I have a chance to be there for my

22  children, for my wife, and family, to take care of them and

23  support them every day.  I know that's what my family needs.

24          Thank you for listening to me today.

25          THE COURT:  Thank you, sir.

O9IHAbrS

1      Is there any reason why sentence cannot be imposed at

2  this time?

3      MS. KAMAL:  No, your Honor.

4      MS. HARAMATI:  No, your Honor.

5      THE COURT:  I am required to consider the advisory

6  guidelines range, as well as various other factors that are

7  outlined in a provision of the law that I mentioned earlier.

8  It's 18 United States Code, Section 3553(a).  And I have done

9  so.  Those factors include but are not limited to the nature

10  and circumstances of the offense and the personal history and

11  characteristics of the defendant, because every defendant must

12  be considered individually as a person.

13      Judges are also required to consider the need for the

14  sentence imposed to reflect the seriousness of the offense,

15  promote respect for the law, provide just punishment, afford

16  adequate deterrence to criminal conduct, protect the public

17  from future crimes of the defendant, and avoid unwarranted

18  sentencing disparities, among other things.

19      As I said at the sentencing of your brother Yoel, you

20  and your three brothers participated in a very elaborate and

21  brazen scheme to defraud.  You intentionally and extensively

22  overshipped items on purchase orders, at times in the

23  thousands, causing Amazon to pay for goods it had never

24  ordered.  You also engaged in unit manipulation where you would

25  substitute a multipack unit with a single item.  Throughout the

O9IHAbrS

course of the conspiracy, through group texts, you and your

codefendants repeatedly discussed how to evade detection by

Amazon.  And when Amazon detected overshipping, you advised

your brother to apologize and blame it on warehouse mistakes.

You even went so far as to suggest bribing an Amazon employee

or hacking their systems, and your motivation for doing so was

simple:  It was greed.  In your own words, to make the

millions.

I do appreciate, and I think it really matters, that

at times you expressed hesitancy about engaging in this kind of

fraud, a desire to build a legitimate business.  Unfortunately,

you didn't do that.  So I've considered the nature of that

crime, as I must.

I have also considered who Mr. Abraham is as a person.

He is —— are you 33 or 34 now?

THE DEFENDANT:  34.

THE COURT:  34.

He has no other criminal history.  He has no history

of violence of any sort.  He's married.  I've heard a lot and I

read, of course, a lot about all of the help and support and

care that you give not just to your children and your wife but

your extended family and your community, including by

volunteering as an EMT, having assisted in opening the

synagogue where you let people in without having to pay.

I am cognizant of the financial and emotional hardship

O9IHAbrS

that your family will face in your absence.  I do think, as
your lawyer noted, all of this presentence rehabilitation is
really relevant.  We want people to do that.  We want people to
change.  And I do think that your actions have shown that you
appreciate the seriousness of the offense, that you're not
likely to recidivate, that you do ⸺ at least now, you didn't
before ⸺ but that you do now have a respect for the law.  So
all of that really matters.

I know that you're scared and, as you noted in your
letter, that you fear for your children and your future and
your wife, and I understand all of that.  Sadly, it's often the
case that it is the family members of a defendant who suffer
the most from the consequences of criminal conduct.  And I
read, as I said, all the letters from your loved ones.  I know
you share this close relationship.  So I have thought about all
of that, all of your efforts towards rehabilitation, who you
are as a person, and everything I already mentioned.

But I also have to impose a sentence that reflects the
seriousness of the offense, that does promote respect for the
law, not just to you but to the world more broadly, that
provides just punishment and, I think critically, that deters
not just you but others from engaging in similar conduct.  So,
ultimately, I have considered all of that.

I have also considered, as we talked about at length,
the need to avoid unwarranted sentencing disparities.  It

O9IHAbrS

1    appears that Mr. Abraham is the least culpable or equally less

2    culpable, with one of his brothers, than the others, both in

3    terms of the amount of money of the intended loss, but I think,

4    more importantly, his hesitancy, because, again, what that

5    shows to me is he wanted to do the right thing.  He didn't do

6    it.  He didn't have the strength to do it.  He let greed take

7    over.  But I think that means that you're less likely to

8    recidivate.

9              So I've considered all that.  Ultimately, while I

10   agree with both probation and the defendant that a variance, a

11   downward variance, is appropriate here, I also agree with the

12   government and probation that a prison sentence is warranted,

13   given the egregiousness of the conduct and the importance of

14   deterrence in a case like this.

15             So I am going to ask you to stand, Mr. Abraham, while

16   I impose sentence.

17             It is the judgment of this Court that you be committed

18   to the custody of the Bureau of Prisons for a term of 15

19   months, to be followed by a term of supervised release of three

20   years.  I believe that this sentence is sufficient but not

21   greater than necessary to comply with the purposes of

22   sentencing set forth in the provision of the law I mentioned,

23   18 United States Code, Section 3553(a).

24             You can be seated if you'd like while I read the other

25   conditions of your release.

O9IHAbrS

1        Before I do that, I wanted to note a couple of things.

2    First of all, I want to note I would have imposed the exact

3    same sentence even if I had adopted the guidelines range in the

4    plea agreement, so I want that to be clear.

5        I also want to be clear that this sentence is

6    consistent with other sentences imposed in this district, in

7    fact, a little bit below according to the search I did on the

8    sentencing commission's publicly available interactive website.

9    That data indicated that for offenses where 2B1.1 is the

10   primary guideline and where the defendant was in a sentencing

11   zone of D and had a criminal history category of I, the average

12   length of imprisonment in this district was 28 months,

13   significantly higher than the sentence I imposed, and the

14   median was 20 months, so closer.  But, again, my sentence was a

15   little bit lower here.

16       There was then an average supervised release period of

17   33 months and a median of 36.  Here, the supervised release

18   term will be that median of 36 months, and that data comes from

19   176 cases.  Part of the reason I am varying downward to the

20   degree that I am are just all of the reasons that your lawyer

21   so eloquently noted:  That your rehabilitation, that your

22   efforts to change your life, to help your community have really

23   shown that you appreciate the harm that you caused and that you

24   are not likely to recidivate.  So that all really mattered to

25   me, and I want to send that message, as well as the one that

O9IHAbrS

1   there will be serious consequences if you engage in a crime as

2   serious as this one.

3          So with respect to your supervised release, you'll be

4   on supervised release for three years.  The standard conditions

5   of supervised release are on pages 33 and 34 of the presentence

6   report.  I'm happy to read them out loud, but if you waive

7   their public reading, I won't read them out loud.

8          But I just want to get your assurance that you'll go

9   over them at length with Mr. Abraham.

10          MS. HARAMATI:  Yes, Judge, we will go over them, and

11   we waive the public reading.

12          THE COURT:  With respect to the mandatory conditions

13   on page 32 and top of 33, do you also waive their public

14   reading?

15          MS. HARAMATI:  Yes, Judge.

16          THE COURT:  OK.  But they are all imposed.

17          I am going to read the special conditions recommended

18   by the probation department, which I think are applicable in

19   this case.

20          Number one, you must provide the probation officer

21   with access to any requested financial information, and you

22   must not incur new credit card charges or open additional lines

23   of credit without the approval of the probation officer unless

24   you are in compliance with the installment payment schedule.  I

25   am imposing both of these special conditions because there is

O9IHAbrS

going to be a large forfeiture order, consistent with your

agreed-upon order, and there may well be a hefty restitution

order as well.  But even if there isn't, on the restitution

front, you're going to have serious financial consequences as a

result of this.

         In addition, you shall submit your person, any

property, residence, vehicle, papers, computer, other

electronic communications, data storage devices, cloud storage

or media and effects to a search by any United States probation

officer and, if needed, with the assistance of law enforcement.

The search is to be conducted when there is reasonable

suspicion concerning violation of a condition of supervision or

unlawful conduct by the person being supervised.  Failure to

submit to a search may be grounds for revocation of release.

You shall warn any other occupants that the premises may be

subject to searches pursuant to this condition.  Any search

shall be conducted at a reasonable time and in a reasonable

manner.  I'm imposing this special condition in light of the

nature of the crime, particularly the way that computers were

used.  And you will be supervised in the district of your

residence.

         All right.  I'm imposing the mandatory special

assessment of $100, which shall be paid immediately.

         I am ordering restitution, but I'm reserving judgment

on the amount.  I'm going to refer the amount of restitution to

O9IHAbrS

1    Magistrate Judge Aaron for recommendation.  To be clear, the

2    referral is only for a recommendation.  You'll have the

3    opportunity to object to the recommendation, which I will

4    review.  So you should see a referral order on the docket later

5    today.

6            Then with respect to restitution, I notice, I think,

7    that the forfeiture order was a little bit different in amounts

8    than the plea agreement.  Is that possible?  I was going to

9    refer to the restitution order.

10           I have the consent preliminary order of forfeiture ——

11   sorry, I misspoke.  My deputy just told me I said restitution.

12   I mean forfeiture.  Excuse me for that.

13           But with respect to the forfeiture amount, it seemed

14   like the figures were a little bit different, in part, from the

15   plea agreement.  So I'm relying on the amounts in the consent

16   preliminary order of forfeiture, money judgment.

17           MS. KAMAL:  If I may briefly, your Honor?

18           THE COURT:  Yes, please.

19           MS. KAMAL:  I see no difference between ——

20           THE COURT:  They're not.  OK.

21           MS. KAMAL:  In the plea agreement on page 2, very top

22   of the page, the left-hand corner, there's the imposition of a

23   money judgment equal to $967,696.

24           THE COURT:  OK.

25           MS. KAMAL:  And on the first page of the consent

O9IHAbrS

1    preliminary order of forfeiture, which was entered at the same

2    time, the defendant agreed to forfeit a sum of money equal to

3    967,696.  I think what the Court may be referring to ——

4            THE COURT:  $500,000, was that figure —— let me just

5    get the plea agreement out.  I have the forfeiture order in

6    front of me.

7            (Discussion off the record)

8            THE COURT:  In any event, go on, please.

9            MS. KAMAL:  I just wanted to say, your Honor, the plea

10   agreement contemplates, and the parties agreed to, the

11   imposition of a money judgment of, as I just said, that figure

12   of $967,696.  That is the same amount reflected in the third

13   paragraph, the third "whereas" paragraph, in the consent

14   preliminary order of forfeiture.  I think the confusion here

15   may be that the defendant has consented to the money judgment,

16   which is the total amount owed in forfeiture, but there was

17   specific property seized prior, at the time of arrest, and so

18   the forfeiture order and the plea agreement contemplate and the

19   parties agree to the defendant waiving any claim to that

20   specific property.

21           THE COURT:  I think what threw me off was the language

22   of the up to $500,000, for example, held in JPMC bank account

23   —— and I'm not going to read the number —— and then up to

24   500,000 in a different bank account, and the figures on page 2

25   of the preliminary order of forfeiture were over $650,000 from

O9IHAbrS

1    one bank account and then significantly less in another one.

2    That's just what threw me off.

3         The only point I meant to say was I want to confirm

4    that you all agree that there's no disagreement that forfeiture

5    should be entered in the amount in the consent preliminary

6    order of forfeiture.

7         MS. KAMAL:  That's correct, your Honor.

8         MS. HARAMATI:  Yes, your Honor.  Just to make sure

9    that it's totally clear ——

10        THE COURT:  Yes.

11        MS. HARAMATI:  —— the entire amount of the forfeiture

12   is this $967,696, and the amount that was seized goes towards

13   —— the $822,563.12 that was seized in total from those two bank

14   accounts referenced goes towards that 906-some-odd-thousand

15   forfeiture judgment.

16        THE COURT:  All right.  For purposes of the record

17   today, I am ordering forfeiture in the amount of $967,696 in

18   United States currency, which shall include the specific

19   property mentioned in the consent preliminary order of

20   forfeiture, and I'm incorporating the entirety of this

21   forfeiture order into my judgment.

22        All right.  Why don't we talk about a surrender date

23   and any recommendations you have with respect to a facility

24   before I read Mr. Abraham his appellate rights.  So usually it

25   will be about 60 days, but what would you propose?

O9IHAbrS

1          MS. HARAMATI:  May I just confer with my client?

2          THE COURT:  Sure.

3          (Counsel conferred with defendant)

4          MS. HARAMATI:  Your Honor, to allow Mr. Abraham to

5    stay out for the Jewish holidays and also to celebrate Hanukkah

6    with his family, we'd ask for a report date of January 6, 2025,

7    and I'd also ask the Court to recommend designation at the

8    satellite camp at FCI Otisville.

9          THE COURT:  Where?  Sorry.

10         MS. HARAMATI:  The FCI Otisville camp.

11         THE COURT:  Yes.  So you will surrender for your

12   sentence on January 6, 2025.  I'll make that recommendation

13   with respect to FCI Otisville, but, as you know, it's

14   ultimately up to the Bureau of Prisons.  So you are to report

15   there by 2 p.m., to wherever you're designated.  Not there, but

16   wherever you're designated by the Bureau of Prisons by 2 p.m.

17   on that date.

18         I should note that it is no longer the case that

19   people report to the MDC.  So if, for some reason, you don't

20   get that designation in advance, I'm just going to ask the

21   lawyers just to reach out to the Bureau of Prisons and the

22   government as soon as possible about that.

23         All right.  Does either counsel know of any legal

24   reason why I cannot impose this sentence?

25         MS. KAMAL:  No, your Honor.

O9IHAbrS

1          MS. HARAMATI:  No, Judge.

2          THE COURT:  All right.  That's the sentence of this

3     Court.  You have a right to appeal your conviction and sentence

4     except to whatever extent you may have validly waived that

5     right as part of your plea agreement.  If you do choose to

6     appeal, the notice of appeal must be filed within 14 days of

7     the judgment of conviction.  If you are not able to pay the

8     cost of an appeal, you may apply for leave to appeal *in forma*

9     *pauperis*, which simply means that court costs, such as filing

10    fees, will be waived.  If you request, the clerk of court will

11    prepare and file a notice of appeal on your behalf.

12         Does the government move to dismiss the underlying

13    indictment and any open counts?

14         MS. KAMAL:  Yes, your Honor.

15         THE COURT:  All right.  They'll be dismissed.

16         Mr. Abraham, I said this to your brother, and I often

17    say it at sentencing.  I don't think people need to be defined

18    by the worst mistakes they've ever made.  You don't need to be

19    defined exclusively by this conduct.  You will be defined by a

20    lot more, and you already are, just looking around this

21    courtroom, seeing how many members of your community are here

22    to support you, having read all of the letters from so many of

23    your loved ones who talk about you in such glowing terms as

24    empathetic and diligent and sensitive and generous and loving

25    and a dedicated family man.

O9IHAbrS

1          But it's really going to be up to you to continue to

2   define yourself, and I hope you do it in a way that you have

3   articulated you want to, and I believe you're going to, for the

4   remainder of your life.  I hope you've learned something from

5   this experience and move forward in a positive, law-abiding

6   fashion.  I wish you luck with that.

7          Are there any other applications at this time?

8          MS. KAMAL:  No, your Honor.  Thank you.

9          MS. HARAMATI:  Nothing further, Judge.

10         THE COURT:  We're adjourned.  Thank you.

11         (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25